103 So.2d 14

ALABAMA POWER COMPANY

v.

ALABAMA PUBLIC SERVICE COMMISSION et al.

4 Div. 927.

Supreme Court of Alabama.

March 6, 1958.

Rehearing Denied June 5, 1958.

Mike Sollie, III, Ozark, and Martin & Blakey, Birmingham, for appellant.

**476**

Douglas Brown and Henry B. Steagall, II, Ozark, John Patterson, Atty. Gen., and Robt. G. Kilgore, Asst. Atty. Gen., for appellees.

SIMPSON, Justice.

The Alabama Power Company has been operating an electric utility in Ozark, Alabama for thirty years under a non-exclusive franchise which is unlimited in duration. The Utilities Board of the City of Ozark (being properly authorized by charter and resolution) notified the Alabama Power Company pursuant to the provisions of Section 342, Title 48, of the Alabama Code of 1940, that it proposed to engage in the business of operating an electric system within the City of Ozark, and expressed a willingness to buy certain facilities of the company in and near said city.

No sale of the facilities being consummated, more than sixty days later the Board petitioned the Alabama Public Service Commission under the provisions of Section 344, Title 48, Alabama Code of 1940. The Commission held a hearing pursuant to the terms of said Section and issued an order stating, among other things not here pertinent, as follows:

"The Commission finds and determines that the present value of the physical property involved is $750,000.-00 and that due to lack of and factual evidence thereon no allowance for severance damages, if there be any, can be made. The Commission therefore finds and determines that the price to be paid by applicant for the property sought to be acquired ought to be and is hereby determined to be $750,000.00."

The Power Company appealed to the Circuit Court under the provisions of Section 345, Title 48, Code of 1940. The Circuit Court entered a decree confirming the Commission in all things except in regard to severance damages, the Court finding that the maximum amount of such damages had been agreed to by the Board. The Court decreed that "the total price which ought to be paid by the Utilities Board of the City of Ozark, Alabama, to Alabama Power Company for said property sought to be acquired is hereby fixed and determined to be $862,500". The power company has appealed to this Court from the Circuit Court's decree.

There is no question here as to the findings of the trial court from a factual standpoint. That is, if the law was correctly interpreted and applied to the facts the decree must be affirmed. The power company contends that the decision of the trial court

and commission are erroneous in that no consideration was given to certain "damages" that the company might sustain from the proposed sale. The "price" to be paid for the facilities in the event the sale is consummated was determined in the proceedings below according to the following formula: Reproduction costs minus depreciation plus severance damages equal "price".

The Company's contention is outlined in the following testimony of a Company official:

"So that if the company had been operating solely as a generating and transmitting company selling at wholesale to such 224 incorporated municipalities during the year 1955, its revenue would have been approximately $28,000,000 less than the company actually received in 1955 from its retail operations in such municipalities and the police jurisdiction thereof. * *

"In the first place, I would like to emphasize that I am not claiming these values as a value or price for rate-making purposes or for tax purposes, and that we are not considering merely a market price or market value of physical property alone. Certainly, from the standpoint of the Alabama Power Company, the price cannot be fixed merely upon the basis of the physical property involved; that is, the physical property constituting the electric distribution system in Ozark. This is true regardless of whether the price of the physical property is based upon its original cost, its cost of reproduction, or its fair value as physical property. The situation that we are confronted with here is not one that we can resolve by looking at Ozark alone. As I mentioned, we serve at retail in 223 other incorporated towns and cities in addition to the City of Ozark. All of those cities and towns have the same basic rights which the City of Ozark or its Utilities Board has. We therefore have to consider what would be the effect on our company if all of

these cities and towns were to adopt the program undertaken by The Utilities Board· of the City of Ozark. In other words, we have to regard the possibility that the acquisition and operation of our company's properties in Ozark might be the first step in a program of dismemberment of our company. I have mentioned the tremendous loss of revenue which would result from such dismemberment. Of course, the company could not suffer any such loss of revenue without the most drastic sort of reorganization. For instance, it would mean the loss of thousands of jobs of our people because there would be no place for them to work or revenue to pay them with. A great deal might be said as to the bad effect upon the State as a whole if such a result should occur, but I am trying to confine my remarks to the company itself. Consideration must be given to what the effect of such a transformation of the company's business would have on its credit and consequently upon the carrying out of the company's plans for expansion. In other words, if the damage to the Alabama Power Company is to be the measure of what is a fair price to be paid, then that damage, when all factors are considered, is more, in my opinion than the worth of the property to The Utilities Board of the City of Ozark. I, of course, have no authority to speak for the Board of Directors of our company, but because of the facts which I have mentioned, I would not consider recommending the sale of the property to The Utilities Board of the City of Ozark for anything like the price that has been offered or for less than say $4,000,000 under the existing circumstances, including, of course, the tax laws."

It is contended by counsel for the power company that their claim is supported in part by the fact that the phrase "just compensation" is used in Section 345 of Title 48. It is argued that the term

is borrowed from eminent domain proceeding and so used it means " * * * the value of the land taken and the damages inflicted by the taking—such a sum as would put him in as good a position pecuniarily as he would have been if his property had not been taken * * *" (quoted by counsel from the case of Campbell v. U. S., 1924, 266 U.S. 368, 45 S.Ct. 115, 116, 69 L.Ed. 328). We are not sure that a pursuit of an analogy with eminent domain proceedings would avail the power company any advantage but we are clear to the conclusion that an understanding of the term "just compensation" must be found within the provisions of Sections 342–347, Title 48. It is to be noted that the term is used only once and that is in Section 345. This section deals with the scope of review by the Circuit Court of the commission's order. Thus, it is seen that the law nowhere instructs the commission to determine the "just compensation" that should be paid for the facilities, yet the Circuit Court on appeal is to determine whether or not the commission has erred in "determining the just compensation". The commission's duties are set out in Section 344 and it must be concluded that if that section is correctly followed the requirement of "just compensation" found in Section 345 will have been met. Certainly it was not intended that the commission was directed to initially proceed in one direction and the Circuit Court on appeal in another. Therefore, there can be no difference between the "price" referred to in Section 344 and "just compensation" as used in Section 345. Thus: Just compensation equals Fair value plus Severance damage (price). The whole problem resolves itself into a consideration of what determines "fair value" and what is included in "severance damages".

Counsel for the company argues at great length that the legislature's choice of the word "price" is of great significance. It is argued that "price" always looks at a transaction from the standpoint of the seller and that it is the sum of money or other equivalent that a prospective seller places on his property. But it is also true that "price" is the consideration paid in a sale. Section 344 speaks in terms of a sale, contemplates a sale, uses terminology of a sale. We attach no great significance to the use of the word "price". Indeed, we cannot suggest a better term.

■ But is is argued extensively that the legislature clearly intended for all of the company's claimed damages to enter into the determination of price because of the use of the term "fair value". It is argued that this is something more than "market value" and that failure of the legislature to use the term "market value" shows that we should set a "price" on the company's facilities based upon the considerations set out above in the testimony of the company official. If there is any significance to the fact that the term "market value" is not used it is in opposition to the company's contentions. This is clearly illustrated by the fact that future earning capacity and good will would ordinarily help determine "market value" but it is specifically directed in Section 344 that such matters are to be excluded from the determination of "fair value". Thus, we conclude that if there is any difference between the "fair value" expression in Section 344 and "market value" commonly in use the former is more restricted in scope than the latter. We think that Section 344 quite clearly and plainly sets out the formula for computing the price of the company's facilities and that it was followed in the proceedings in this case.

■ It may be that the company's fears are more real than fanciful but it is also true that the damages claimed are more remote than direct and more speculative than certain. The company official testified: "It's an opinion thing as to what it would do, but no telling what it would cost us—the price and the interest on our next bond issue". One of the fundamental rules of damages is that to be compensable they must be direct and reasonably certain, not remote and speculative. Southern Railway Co. v. Coleman, 1907, 153 Ala. 266, 44 So.

837. We are impressed that the company's figure $4,000,000 was "taken out of the air" rather than computed. If the power company cannot calculate with reasonable certainty its damages then neither can this Court even if we were authorized to do so. However, it is our conclusion that the damages claimed by the company are exactly what the legislature had in mind when it authorized "severance damages" and since the Circuit Court awarded the maximum amount provided by law the company has no meritorious complaint here.

It is argued that the conclusion thus attained will not give the company the "protection" the legislature intended. Just what then is the "protection" intended? The company is not required to sell at the price set by this proceeding but the statute seems to indicate that the Board is required to buy if the company wishes to sell. It was decided by this Court in Alabama Power Co. v. City of Guntersville, 1937, 235 Ala. 136, 177 So. 332, 114 A.L.R. 181, that a municipality had the legal right to construct and operate an electric system in competition with the utility that had been serving the area. Such an act would cause a great loss to the utility and render its facility in such municipality greatly less in value. Sections 342 and 347 of Title 48 are an expression of legislative feeling that before the municipality takes such action it should first offer to purchase the utility's facilities at a price based on their fair value and damages caused from the severance of the facilities from the utility's total operating unit. This, we think, was the protection intended and that it has been afforded the appellant in the case in hand. Were the argument of the appellant projected to its logical conclusion, it could result in setting a "price" so high that the Board could not purchase, and other municipalities would be discouraged from following Ozark's example. The end result might be to "price" the company's facilities out of the market and thereby enable it to maintain a monopoly. We do not think the legislature intended to accord a utility this kind of "protection".

It may be well to add that other states have had statutes similar to ours and we consider the following cases to be supportive of our decision: Gloucester Water-Supply Co. v. City of Gloucester, 1901, 179 Mass. 365, 60 N.E. 977; Newburyport Water Company v. City of Newburyport, C.C., 103 F. 584, at page 591.

Affirmed.

LAWSON, GOODWYN, MERRILL, and COLEMAN, JJ., concur.