669 So.2d 817 (1995)
MANNINGTON WOOD FLOORS, INC.
v.
PORT EPES TRANSPORT, INC.
1930436.
Supreme Court of Alabama.
August 11, 1995.
Rehearing Denied October 27, 1995.
*818 Richard F. Ogle and Paul A. Liles of Schoel, Ogle, Benton and Centeno, Birmingham, for Appellant.
K. Scott Stapp of Phelps, Jenkins, Gibson & Fowler, Tuscaloosa, John A. Owens of Owens & Carver, Tuscaloosa, and J.L. Chestnut, Jr. of Chestnut, Sanders, Sanders & Pettaway, Selma, for Appellee.
COOK, Justice.
Mannington Wood Floors, Inc. ("Mannington"), appeals a judgment entered on a jury verdict in favor of Port Epes Transport, Inc. ("PET"), in PET's action against Mannington alleging breach of contract and fraud. We affirm.
PET's dispute with Mannington, a corporation producing wood products at a mill in Port Epes, Alabama, arose out of the following facts. In August 1991, Tom Tartt, a Mannington official in charge of output scheduling and product transportation, solicited bids for the trucking of wood chips to Purdue Hill, Alabama. Preston Minus, the owner and operator of L.S.E., a sole trucking proprietorship, submitted bids to Mannington for the transportation of chips. Minus's letter of submission sought, among other things, "100% of movement."[1]
On October 22, 1991, Tartt telephoned Minus to tell him that Mannington had accepted Minus's bid for the transportation of its wood *819 chips. In addition to the discussion regarding the hauling of wood chips, that telephone conversation included discussions regarding Minus's hauling of bark (see note 1) to various points of delivery in Alabama, including Demopolis, Selma, Pine Hill, and Pennington, and to one point in Mississippi. The parties tentatively agreed on prices Minus quoted for hauling bark to those points.
Subsequently, Minus met with at least three Mannington officials, including Tartt; "Raz" Carter, Mannington's Alabama operations general manager; and "Buddy" Frizzell. At this meeting, Mannington and Minus executed an instrument purporting to be a "chip hauling contract." The instrument, which was drafted by Mannington, provided in pertinent part:
"WHEREAS, [Mannington] desires to have chips, bark, sawdust and fuel generated or accumulated by [it] delivered pursuant to its contracts with International Paper Company in Selma, Alabama, McMillan Bloedel located in Pine Hill, Alabama, and Container Corporation located in Brewton, Alabama, and Alabama River in Purdue Hill, and any other location[s] deemed necessary, and [L.S.E.] desires to contract for the performance of said delivery, all for the consideration and on the terms hereinafter set forth;
". . . .
"1. For and during a period of one year beginning upon the date of execution of this contract [L.S.E.] agrees to deliver chips, bark, sawdust and fuel (hereinafter referred to [as] chips) pursuant to the provisions of this agreement.
"2. The chips to be delivered and the destination of their delivery shall be determined at the sole discretion of [Mannington].
"3. [Mannington] shall pay to [L.S.E.] $7.50 per ton for chips hauled by [L.S.E.] to Alabama River at Purdue Hill. [Mannington] shall pay to [L.S.E.] the sum of [$3.20 per ton] to Demopolis, [$7.50 per ton] to Selma, [$7.25 per ton] to Pine Hill, [$7.50 per ton] to Columbus, [$5.00 per ton] to Pennington ... with 22 ton minimum and other destinations to be negotiated consistent with above price. [Mannington] reserves the right to have chips delivered by [L.S.E.] to other destinations if the volume of chips exceeds the amount required by the contracts with the above named companies. Each individual truck driver employed by [L.S.E.] shall be responsible for weighing his load. Net 10 days from invoice.
"4. [L.S.E.] agrees to have a trailer at the chip bin as needed. [Mannington] shall notify [L.S.E.] of any change in [its] regular hours of operation. [L.S.E.] shall compensate [Mannington] at a rate of $25.00 per hour in the event of any interruption of the operation mode. L.S.E. will be responsible for cost incurred for cleaning up chips due to driver neglect. Also, L.S.E. will be responsible for the cost of reimbursement of chips as warranted.
"5. All chips hauled pursuant to this agreement shall be from [Mannington's] Epes facility. In the event of a permanent shutdown or abandonment of the Epes facility, [Mannington] shall give to [L.S.E.] thirty (30) days' notice prior to the date of the shutdown. [L.S.E.] agrees to continue to haul the chips generated or accumulated during this last period of operation up to the last day of operation.
"6. [Mannington] agrees that [L.S.E.] shall be given the exclusive right to haul chips generated or accumulated by [Mannington] during the term of this agreement. In the event [L.S.E.] is unable or fails to haul all chips pursuant to this agreement, [Mannington] shall have the right to obtain these services from other sources. In the event [Mannington] is unable to obtain these services for the same or lesser rates as provided herein, [L.S.E.] shall indemnify [Mannington] for any sums expended in excess of the rates contained herein.

"7. It is agreed that this is a requirements contract. [L.S.E.] is not guaranteed a minimum number of loads but is guaranteed the exclusive right to haul all loads generated."
(Emphasis added.) The effective date of the agreement was January 22, 1992.
*820 During the time of the discussions leading to the execution of the agreement, Tartt and Carter told Minus that Mannington would eventually open a market for its chips in Japan and would then ship some or all of its chips by barge, rather than by L.S.E.'s trucks. However, Minus was told that the barging would not begin until the period of approximately January to April 1993.
Before the effective date of the contract, Minus and one other person, formed a corporationPort Epes Transport, Inc. ("PET") for the purpose of hauling Mannington's wood products. With Mannington's permission, L.S.E. assigned the contract to PET. In order to perform its responsibilities under the contract, PET, with Mannington's knowledge and acquiescence, purchased additional equipment, incurring expenses in the amount of $500,000. PET began hauling chips and bark on January 22, 1992.
In March 1992, Tartt telephoned Minus and told him that the Japanese market had materialized faster than Mannington had anticipated, that shipments to Japan were imminent, and, consequently, that Mannington would immediately be barging its chips to Mobile for export. Thereafter, Mannington shipped virtually all its chips by barge. Although Mannington continued to transport bark by PET's trucks, it is undisputed that from January 22, 1992, to January 22, 1993, Mannington barged 447,000 tons of chips to Mobile. When Minus complained to Mannington's officials about the reduction in the volume of chips available for transportation, Frizzell and Carter told him that "there would always be the bark" to haul.
Moreover, in September 1992, Percy Zeigler, Jr., Mannington's chief financial officer in charge of Alabama operations, began complaining about the amount PET was receiving for hauling bark, and pressed Minus to renegotiate the prices. On September 28, 1992, a meetingattended by Carter, Zeigler, Minus, and the other PET shareholder was convened to discuss the matter. At that meeting, or as a result of that meeting, PET agreed to a reduction in the bark-haulage rates in exchange for an extended expiration date on his exclusive contract to haul the bark. In effect, PET agreed to lower its prices for hauling bark in exchange for a "second," or, renegotiated, contract, the duration of which was from October 1, 1992, to September 30, 1993. The agreement reflecting the renegotiated prices was memorialized in a letter from Minus addressed to Carter and dated September 29, 1992. Carter subsequently signed this agreement. On October 1, 1992, PET began hauling bark under the renegotiated contract.
Two months later, that is, in December 1992, Tartt telephoned Minus and told him that Mannington was preparing to barge about 70% of its bark. Minus warned Tartt of "serious problems" if it began barging bark. Nevertheless, Mannington almost immediately began barging bark to Mobile.
On March 19, 1993, PET and L.S.E. filed a four-count complaint against Mannington and Zeigler. Count One alleged that Mannington had breached the "first" contract. Count Two alleged that Mannington had breached the "second" contract.
Counts Three and Four alleged fraud in the inducement of both contracts. More specifically, Count Three contained the following allegations:
"2. In October or November of 1992, the plaintiff and defendants had entered into the original requirements contract, Raz Carter, as General Manager of Mannington's Epes facility, and others told Mr. Minus that he would be the exclusive hauler of all chips, bark, sawdust and fuels for fifteen (15) to eighteen (18) months.
"3. The representations made by the defendants were false and the defendants knew they were false or the defendant, without knowledge of the true facts, recklessly misrepresented them or the defendants' representations were made by mistake with the intention that the plaintiff should rely upon them.
"4. Plaintiffs believed the representations and acted in reliance upon them by purchasing equipment, and other materials, costing more than $500,000.00.
"5. Plaintiffs further allege that defendants had no intention of fully utilizing this equipment or complying with the original requirements contract in good faith at the *821 time these representations were made to the plaintiffs."
Count Four contained the following allegations:
"1. Plaintiffs reallege each and ever[y] allegation as set out above.
"2. On or about September 28, 1992, Preston C. Minus, Jr. met with Raz Carter and Percy R. Zeigler, Jr. regarding the extension of the original requirements contract.
"3. At that time, Mr. Zeigler proposed that Epes Transport reduce its rates for hauling chips and bark by nine (9%) percent to fifteen (15%) percent (depending on the location of hauls) in exchange for Mannington extending the original requirements contract an additional fifteen (15) months. Mr. Minus accepted the reduction in rates in order to get a 15 month extension of the contract to which Mannington agreed.
"4. These representations made by defendants were false and defendants knew they were false or defendants without knowledge of the truth of these facts recklessly misrepresented them or defendants' representations were made by mistake but with the intention that plaintiffs should rely upon them.
"5. Plaintiffs believed these representations and relied upon them by making preparations for hauling, paying expenses for licenses and tags for hauling which they would not have otherwise paid and plaintiffs also lost other opportunities for hauling in reliance on these representations."
All four counts were eventually submitted to a jury, accompanied by instructions requiring it to focus on the following claims:
(1) L.S.E. v. Manningtonfraud;
(2) PET v. Manningtonfraud;
(3) PET v. Manningtonbreach of contract;
(4) PET v. Zeiglerfraud.
The parties agreed that L.S.E. could not recover damages for breach of contract, because it had assigned the contract to PET before the breach, and, similarly, that its fraud claim was limited to the representations made in connection with the "initial" contract. They agreed, moreover, that PET could not recover damages for fraud arising out of representations made in connection with the initial contract, because PET had not come into existence at the time those representations were made.
The jury returned its verdict in the following form:
"We, the Jury, find for the Plaintiff, Port Epes Transport, Inc. and against the Defendant, Mannington Wood Floors ..., as follows:
"1. For Breach of Contract, we assess the Plaintiff's damages at Two Million ($2,000,000.00) Dollars.
"2. For Fraud, we assess the Plaintiff's damages at One Million ($1,000,000.00) Dollars.
"It is our intention to assess total damages to the Plaintiff, [PET,] and against the defendant, Mannington Wood Floors ..., at Three Million ($3,000,000.00) dollars....
"We, the Jury, find in favor of the Defendant, Percy Zeigler."
(Emphasis added.) The jury also returned uncompleted and unsigned a form that would have evidenced a finding in favor of "the plaintiff, L.S.E., and against the Defendant, Mannington ... for fraud in the first contract." (Emphasis added.) Thus, the jury found for PET for (1) breach of the first contract; or (2) breach of the second contract, or (3) breach of both contracts; and for (4) fraud in connection with representations about the second contract. It found against PET on its fraud claim against Zeigler in connection with his representations regarding the second contract, and it found against L.S.E. on its fraud claim against Mannington based on representations regarding the first contract. The trial court entered a judgment on this verdict. Mannington appeals.
Mannington makes two primary contentions. First, it contends that PET failed to prove damages for breach of contract with sufficient certainty, and, consequently, that the verdict on that claim was based on pure speculation. Second, it argues that its liability for fraud as to the second contract must have been based on the doctrine of respondeat *822 superior, specifically, that it must have been based on Zeigler's representations to PET; thus, because the jury exonerated Zeigler, Mannington argues that the verdict against it was inconsistent. We disagree with these contentions.

I. Breach of Contract
Mannington vigorously contends that the rule applicable here is the one governing the burden of proof borne by previously unestablished businesses to show the loss of anticipated profits. See, e.g., Kirkland & Co. of Anniston, P.C. v. A & M Food Serv., Inc., 579 So.2d 1278, 1285 (Ala.1991) ("In Alabama, anticipated profits of an unestablished business may be recovered if such damages are proved with `reasonable certainty' "). Mannington, however, overlooks the fact that damages were computed in this case based, not on the anticipations of an unestablished business, but on prices set forth in the contracts. Moreover, both of these contracts were negotiated by Preston Minus, who was the sole owner and proprietor of L.S.E., a well-established trucking company, and who also was a 50% owner of PET, which was organized specifically to deal with Mannington.
The only substantive differences between the first and second contracts were the effective dates and the prices for hauling bark; these points were never in serious contentioneither at trial or on appeal. In both contracts, PET had "the exclusive right to haul all loads generated" by Mannington. (Emphasis added.) It is undisputed that Mannington barged 447,000 tons of chips to Mobile within the effective dates of the contracts, thus depriving PET of the right to haul those chips.
The $2 million compensatory damages award can be "reproduced" by using computations based on rates set forth in the contracts. For example, 447,000 tons barged, divided by 22 tons, the minimum load per truck required by the contract, equals 20,318 truck loads that could have been hauled by PET. That number of loads at $210 per load, the haulage rate to Pine Hill in the second contract, equals $4,266,780. Minus testified that his expected profit margin was 47%. This percentage rate, applied to $4,266,780, equals $2,005,386.60.
Moreover, the evidence clearly and convincingly supported a finding that Mannington had breached both contracts. Again, the evidence indisputably demonstrated that Mannington had barged 447,000 tons of chips to Mobile during the period from January 22, 1992, to January 22, 1993. Because the second contract took effect on October 1, 1992, a portion of the 447,000 tons was barged to Mobile during the effective date of the second contract. Thus, a substantial portion of the 447,000 haulage was referable to the second contract, just as a portion was referable to the first. It was further undisputed that during the effective dates of the second contract Mannington barged a substantial amount of bark, which was also subject to the exclusivity provisions of the contracts.
In computing damages for breach of contract, a jury need not achieve "mathematical precision." United Bonding Ins. Co. v. W.S. Newell, Inc., 285 Ala. 371, 380, 232 So.2d 616, 624 (1969). Indeed, "`the uncertainty which prevents a recovery is uncertainty as to the fact of the damage and not as to its amount.'" Id. Thus, a "`plaintiff will not be denied a substantial recovery if he has produced the best evidence available and it is sufficient to afford a reasonable basis for estimating his loss." Id.
Moreover, Mannington's use of the phrase "lost profits" is ambiguous and misleading. In reality, PET is merely seeking its "expectancy interest," that is, the "benefit of its bargain." This Court recently addressed some of the aspects of the term "lost profits." Med Plus Properties v. Colcock Constr. Group, Inc., 628 So.2d 370 (Ala.1993). In that case, the Court stated:
"`It is well settled that damages awarded for breach of contract should return the injured party to the position he would have been in had the contract been fully performed.' Cobbs v. Fred Burgos Constr. Co., 477 So.2d 335 (Ala.1985); see also Comeq, Inc. v. Mitternight Boiler Works, Inc., 456 So.2d 264 (Ala.1984); Files v. Schaible, 445 So.2d 257 (Ala.1984); B & M *823 Homes, Inc. v. Hogan, 376 So.2d 667 (Ala. 1979)....
". . . .
"... The phrase `lost profit' has been used either to designate an item of what is often called `general' or `expectancy' damages, or to designate a form of `consequential damages.' One commentator has observed:
"`Many claims for consequential damages are claims for loss of profits. The term profit is sometimes used loosely to refer to any gain the plaintiff would have made but for the contract breach. But some gains, such as gains in a simple market transaction, are not profits in the sense that income from business operations are profits. On the contrary, if the breach of contract causes the plaintiff to lose a market gain, the claim is merely one for general damages as to which no special proof requirements attach.'
"`3. Dan Dobbs, Law of Remedies § 12.4(3), at 71 (2d ed. 1993); see also id. § 12.20(1). As Dobbs recognized, one relevant consequence of this distinction is that `special proof requirements' apply to consequential damages and not to general damages. In Alabama and other jurisdictions, the `special proof requirement[]' is embodied in the rule of `reasonable certainty.' Morgan v. South Central Bell Telephone Co., 466 So.2d 107 (Ala.1985). With regard to consequential, loss-of-profit damages, this Court has stated:
"`In order that it may be a recoverable element of damages, the loss of profits must be the natural and proximate, or direct, result of the breach complained of and they must also be capable of ascertainment with reasonable, or sufficient, certainty, or there must be some basis on which a reasonable estimate of the amount of the profit can be made; absolute certainty is not called for or required.'
"Paris v. Buckner Feed Mill, Inc., 279 Ala. 148, 149, 182 So.2d 880, 881 (1966). The analysis advocated by Med-Plus and the authority it cites in support of it apply only to consequential, loss-of-profit damages; however, CCG seeks only general or expectancy damages, in order to place it in the position it would been in if Med-Plus had performed, i.e., the benefit of its bargain with Med-Plus. The rule of `reasonable certainty,' therefore, does not apply."
628 So.2d at 375-77 (emphasis added) (footnotes omitted).
It appears that PET was not seeking "consequential" loss-of-profit damages, but was merely seeking to recover the amount it should have received for shipping wood by-products under the terms of the contract, minus the cost of shipping expenses. In invoking the "reasonable certainty" rule, Mannington is seeking to inject into this case an unnecessarily rigorous standard of proof. The evidence in this case afforded the jury a reasonable basis for its award of contract damages.

II. Fraud
Mannington also contends that the $1,000,000 punitive damages award on PET's fraud claim cannot be sustained, because, it insists, if its liability arises out of Zeigler's representations in the negotiations of the second contract, that is, if its liability is grounded on the doctrine of respondeat superior, then the jury's exoneration of Zeigler would, as a matter of law, exonerate Mannington. PET, however, contends that Zeigler was not the only source of misrepresentation. It argues, the record contains evidence of affirmative misrepresentations by other Mannington officials having general or special agency authority to bind the corporation in the contract negotiations.
We agree with PET. For example, when Minus complained about losing the opportunity to haul chips, Frizzell and Carter told him that "there would always be the bark" to haul. R.T. at 58. The evidence clearly suggests that, at least while Mannington was negotiating for lower bark-hauling rates, it did not intend to honor its bark commitments as Minus understood them to be. Indeed, by the time negotiations regarding bark transportation concluded, Mannington's officials were necessarily aware that Minus interpreted the contract as prohibiting the barging of bark. A finding of promissory fraud based on representations of officials *824 other than Zeigler would have been supported by clear and convincing evidence.
In short, we are unpersuaded by Mannington's arguments for reversal. The judgment is affirmed.
AFFIRMED.
ALMON, SHORES, INGRAM, and BUTTS, JJ., concur.
HOUSTON, J., concurs as to the contract claim and dissents as to the fraud claim.
MADDOX, J., recused.
HOUSTON, Justice (concurring as to the contract claim and dissenting as to the fraud claim).
The jury's fraud verdict had to be based on Count IV of the complaint. Count III (the only other fraud claim alleged) involved only a claim by the plaintiff L.S.E., and no verdict was returned against Mannington on that count.
Count IV, in pertinent part, reads as follows:
"On or about September 28, 1992, Preston C. Minus, Jr. [an officer of Port Epes Transport, Inc.,] met with Raz Carter and Percy R. Zeigler, Jr., regarding the extension of the original requirements contract.
"At that time, Mr. [Percy] Zeigler proposed that Epes Transport reduce its rates for hauling chips and bark by nine (9%) percent to fifteen (15%) percent (depending on the location of hauls) in exchange for Mannington extending the original requirements contract an additional fifteen (15) months. Mr. Minus accepted the reduction in rates in order to get a 15-month extension of the contract to which Mannington agreed.

"These representations made by defendants [Zeigler and Mannington] were false and defendants [Zeigler and Mannington] knew they were false or defendants [Zeigler and Mannington] without knowledge of the truth of these facts recklessly misrepresented them or [Zeigler and Mannington's] representations were made by mistake but with the intention that plaintiffs should rely upon them.
"Plaintiffs believed these representations and relied upon them by making preparations for hauling, paying expenses for licenses and tags for hauling which they would not have otherwise paid and plaintiffs also lost other opportunities for hauling in reliance on these representations."
(Emphasis added.)
Rule 9(b), Ala.R.Civ.P., provides, in pertinent part:
"In all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity."
The trial court gave the jury the following instruction, to which no one objected and as to which no one asked for clarification:
"In this case I need to explain to you about the claim against Mr. Zeigler. Mr. Zeigler is sued as a defendant, and he is charged with fraud in this case. That is the only claim against Mr. Zeigler. Now, the plaintiffs allege that Mr. Zeigler was acting in the line and scope of his employment at the time the alleged fraud was committed by him. If someone acts within the line and scope of their employment for someone else at the time they do something, then the employer of that person is equally bound and is equally guilty as the person who does the act. If you are on a job and you're in the line and scope of your employment and you do an act in the line and scope, an act that causes the injury to someone else binds the employer as well as the person who does that act. Now, the claim against Mr. Zeigler is only for fraud."
Zeigler and Mannington were defendants under Count IV. The jury returned the following verdicts:
"We, the jury, find in favor of the Defendant, Percy Zeigler.
"We, the jury, find for the plaintiff, Port Epes Transport, Inc. and against the defendant, Mannington Wood Floors, a division of Mannington Mills, Inc. as follows:
". . . .
"For fraud we assess the plaintiff's damages at One Million Dollars ($1,000,000)."
*825 Reviewing the record, including the pleadings and the above-referenced charge on the doctrine of respondeat superior, I do not think that Rule 15(b), A.R.Civ.P., comes into play. There is nothing to show that the parties expressly or impliedly consented to anything other than the representation of Zeigler, as set out in Count IV, being the representation on which Count IV was tried. Count III was also a fraud count; it involved representations concerning the first contract and the hauling of chips and bark thereunder. The jury did not find against Mannington on this fraud count. To support a $1,000,000 punitive damages award, a finding of fraud must be based on evidence of a misrepresentation as solid as a rock, not on shifting sands of conjecture.
"`The rule that prevails is that, when the principal and his agent are sued in joint action in tort for misfeasance or malfeasance of the servant, and his liability for the conduct of said servant is under the rule of respondeat superior, a verdict in favor of the servant entitles the master to have the verdict against him set aside.'"
Larry Terry Contractors, Inc. v. Bogle, 404 So.2d 613, 614 (Ala.1981), quoting Louisville & N.R. v. Maddox, 236 Ala. 594, 600, 183 So. 849, 853 (1938). See also Roden v. Wright, 646 So.2d 605, 611 (Ala.1994).
I would reverse the judgment for Port Epes Transport, Inc., against Mannington on the fraud count and remand for a new trial on that count.
NOTES
[1] Mannington's operations produce wood by-products, including wood chips and bark. Its process yields approximately 15 tons of bark for every 100 tons of wood chips. In other words, for every 100 tons of chips produced, the quantity of chips and bark would equal 115 tons.