706 So.2d 1169 (1997)
LINDY MANUFACTURING COMPANY
v.
TWENTIETH CENTURY MARKETING, INC.
1951168.
Supreme Court of Alabama.
November 21, 1997.
*1170 F. A. Flowers III and L. Tennent Lee III of Burr & Forman, Birmingham; and Tazewell T. Shepard and John O. Cates of Wilmer & Shepard, Huntsville, for appellant.
David H. Meginniss and S. A. Watson, Jr., of Hornsby, Watson & Meginniss, Huntsville, for appellee.
COOK, Justice.
Lindy Manufacturing Company appeals from a judgment entered on a jury verdict in favor of Twentieth Century Marketing, Inc., in this action seeking damages for fraud and breach-of-contract and seeking a declaratory judgment. We affirm.
Lindy makes three contentions on appeal: 1) The evidence was insufficient to prove that Lindy was obligated to pay commissions to its former sales representative, Twentieth Century, after the termination of the parties' contract; 2) the evidence was insufficient to support the damages award; and 3) the trial court erred in allowing the introduction of an alleged "pattern and practice" of fraud by Lindy.
Lindy Manufacturing Company is a family-owned business located in Huntsville; it manufactures electronics components. Twentieth Century, also located in Huntsville, is an independent manufacturer's representative. In 1986, Twentieth Century and Lindy agreed that Twentieth Century would represent Lindy's products to a local manufacturer of electronic devices. The agreement between Twentieth Century and Lindy did not specify its duration, nor did it address termination of the agreement or payment of commissions upon termination.
Later in 1986, Twentieth Century and Lindy entered an oral agreement that authorized Twentieth Century to sell Lindy's products to a division of Chrysler Corporation, located in Huntsville, that manufactures electronic components for installation in Chrysler vehicles. Domer Ishler, the owner of Twentieth Century, testified that Lindy agreed to pay Twentieth Century a 5% commission on Chrysler orders for Lindy products that *1171 were obtained through Twentieth Century's efforts. Ishler also testified that the parties did not discuss the duration of the agreement, procedures for terminating the agreement, or any payment of commissions upon termination.
In 1988, as a result of Twentieth Century's efforts, Lindy began to receive orders from Chrysler. From 1988 to 1993, Lindy paid Twentieth Century the agreed-upon 5% commission on Lindy's sales to Chrysler. In return, Twentieth Century continually represented Lindy's products to Chrysler; a Twentieth Century representative regularly walked the production lines at Chrysler in case a problem arose involving one of Lindy's products. Additionally, when Chrysler required its suppliers to maintain a "Just In Time" ("JIT") inventory maintenance and delivery system, Twentieth Century, at its own expense and on Lindy's behalf, installed a JIT at its own facility and allowed Lindy to use it.
Domer Ishler testified that Twentieth Century consistently lost money on the Lindy/Chrysler account during the period 1986 through 1993, and that the overall amount of Twentieth Century's loss on the account was $205,000. In 1994, Twentieth Century realized a $12,000 profit on the Lindy/Chrysler account.
In 1993, at Chrysler's request, Lindy installed the JIT system at its plant to handle inventory procedures for parts sold to Chrysler. In April 1993, Twentieth Century's president, Robert Byard, and Varney Harmon, the Twentieth Century representative assigned to the Lindy/Chrysler account, met with Lindy's president, David Collins, and its vice-president, Margaret Hill, to discuss a temporary reduction of Twentieth Century's commissions to 3% so that Lindy could recoup the expense of installing the JIT system at Lindy's plant. According to Byard and Harmon, they told Hill and Collins that Twentieth Century's commission had to be restored to 5% at some point in order for Twentieth Century to realize a profit on the Lindy/Chrysler account.
Following the April 1993 meeting, Hill wrote the following "confirmation" letter to Robert Byard:
"This letter is to confirm our verbal agreement. Lindy will pay Twentieth Century Marketing 5% commission on all [Chrysler] invoices through July 1993. Beginning in August, commission will drop to 3% for a period of two years, and then may increase to 4%.
"This agreement is for [Chrysler] only. Commission for all other customers will remain 5%. This agreement covers production orders. Tooling orders are exempt from commissions."
Both Byard and Harmon testified, however, that the 4% commission referred to in Hill's letter had not been discussed or agreed to at the April 1993 meeting.
In August 1994, discussions began regarding Lindy's terminating its relationship with Twentieth Century. Hill informed Harry Brooks, who had become president of Twentieth Century, that she wanted to hire someone to act as an "in house" manufacturer's representative for the Chrysler account. Following an exchange of letters between Lindy and Twentieth Century, which revealed increasingly hostile positions, Hill wrote a letter to Domer Ishler on November 8, 1994, terminating Twentieth Century as Lindy's representative and enclosing the summons and complaint in this action.
Lindy paid Twentieth Century the 3% commission, agreed upon during the April 1993 meeting, through January 1995. Twentieth Century did not dispute Lindy's right to terminate the parties' agreement, and it did not dispute the payment of the 3% commission. However, according to Twentieth Century, Lindy was obligated to pay commissions to Twentieth Century for as long as Lindy received orders from Chrysler, because the Chrysler account was obtained through the efforts of Twentieth Century.
Lindy, in its declaratory judgment complaint against Twentieth Century, sought declarations 1) of the parties' rights under the "manufacturer's representative agreement" between the parties (particularly regarding Lindy's right to terminate what Lindy alleged was an "at will agreement"); and 2) of the applicability of, and the parties' rights pursuant to, the Alabama Sales Representative's *1172 Commission Contracts Act (Ala. Code 1975, § 8-24-1 et seq. (1996 Cum. Supp.)). Lindy amended the complaint to add a claim for the return of all monies it claimed to have paid to Twentieth Century by mistake after the termination of the agreement or after Lindy was no longer obligated to continue paying Twentieth Century.
Twentieth Century filed an answer, stating affirmative defenses, and counterclaimed for a declaration that it had a property right in future orders Lindy would receive from Chrysler. Twentieth Century contended that it had obtained the Chrysler account for Lindy and, as a result, was "continually due" the commission, without further performance. Twentieth Century also claimed that, pursuant to § 8-24-3,[1] it was entitled to damages equal to three times the loss it had sustained as a result of Lindy's alleged breach of contract.
Lindy denied Twentieth Century's allegations and argued that the relief sought by Twentieth Century would force the parties into "an interminable contractual relationship contrary to public policy and the law of the State of Alabama." Twentieth Century amended its counterclaim to add claims alleging fraud and breach of contract.
The trial court granted Twentieth Century's motion for directed verdict on Lindy's claim regarding the Act, holding that it applied to the pending action, but denied Twentieth Century's motion for directed verdict on Lindy's claim for the recovery of money "paid by mistake." The trial court also denied Lindy's motions for directed verdict on Twentieth Century's fraud and breach of contract claims.
The jury returned a verdict for Twentieth Century on its breach of contract claim against Lindy, awarding compensatory damages of $1,893,645.60 (lost profits and interest, trebled). The jury found in favor of Lindy on Twentieth Century's fraud claim and in favor of Twentieth Century on Lindy's claim for recovery of money paid by mistake. The total amount of the damages awarded by the judgment entered on the jury's verdict was $2,193,645.60 (the compensatory damages award plus $300,000 in attorney fees).
The trial court denied Lindy's post-judgment motions, and this appeal followed.

I.
Lindy contends there is no evidence that it agreed to pay post-termination commissions to Twentieth Century for as long as Chrysler continued to purchase Lindy parts. Because the oral agreement between Lindy and Twentieth Century did not specifically provide for the payment of post-termination commissions, Lindy claims the jury's finding that Lindy was obligated to pay such commissions contravenes Alabama law prohibiting the factfinder from considering the parties' unexpressed intent as to contract terms. Therefore, argues Lindy, the jury verdict for Twentieth Century on its breach-of-contract claim was not supported by the evidence and the trial court should have granted Lindy's motion for a directed verdict on this issue.
In Driver v. National Security Fire & Casualty Co., 658 So.2d 390 (Ala.1995), the appellant claimed that the trial had court erred in denying the appellant's motion for a directed verdict on a particular issue and in submitting that issue to the jury. The Driver Court held:
"A directed verdict is proper (1) where the nonmoving party has failed to present substantial evidence regarding some element essential to his claim, or (2) where there is no disputed issue of fact upon which reasonable persons could differ....
"Whether the trial court erred in denying [the appellant's] directed verdict motion `is tested by a purely objective determination of whether the party having the burden of proof has produced [sufficient] evidence [to create a factual dispute] requiring resolution by the jury.' Ex parte Oliver, 532 So.2d 627, 628 (Ala.1988). Because the trial court's ruling on a directed verdict motion is based on an objective standard, and, thus, is not discretionary, review of such a ruling on appeal is denovo. *1173 Additionally, in reviewing the ruling on a motion for a directed verdict, this Court must view all the evidence in a light most favorable to the nonmovant and must entertain such reasonable evidentiary inferences as the jury would have been free to draw."
658 So.2d at 392 (citations omitted).
A review of the record in this case reveals that there was substantial evidence presented by both parties regarding the issue of payment of post-termination commissions, and that this evidence created a factual dispute from which reasonable persons could draw contrary conclusions. The trial court did not err in denying Lindy's motion for a directed verdict on this issue and submitting Twentieth Century's claim for post-termination commissions to the jury.
According to Lindy, applying Alabama's objective, rather than subjective, test of contract formation (Murray v. Alfab, Inc., 601 So.2d 878 (Ala.1992)) to the evidence proves that there was no "meeting of the minds" as to the duration or termination of its agreement with Twentieth Century, or as to the payment of commissions to Twentieth Century. Therefore, says Lindy, the agreement did not contain the provision that Twentieth Century now seeks to enforce, and an alleged breach of a provision that is not part of the agreement will not support a breach of contract claim. Lilley v. Gonzales, 417 So.2d 161 (Ala.1982).
The oral agreement under which Twentieth Century acted for Lindy was the result of a meeting involving Domer Ishler, the owner of Twentieth Century; David Collins, the owner of Lindy; and Richard Martul, the general manager of Lindy's Huntsville plant. Ishler testified that Twentieth Century brought the Chrysler account to Lindy with the understanding that Twentieth Century would receive a 5% commission on all the Chrysler business Twentieth Century's efforts generated on Lindy's behalf. Ishler stated that the word "indefinitely" may not have been used in the meeting at which the agreement was finalized, but that Lindy did agree that as long as it enjoyed the Chrysler business obtained through Twentieth Century's efforts Lindy would pay Twentieth Century a 5% commission.
Ishler also stated that Martul told him that Twentieth Century would be "protected" on the accounts Twentieth Century developed for Lindy. Collins testified that, in entering the agreement for Twentieth Century to act as Lindy's representative, the parties understood that Lindy would pay for all of the future Chrysler sales Twentieth Century "acquired" for Lindy.
"It is a rule that when the contract is `verbal the jury must find its terms. True, there is a field for the court, when there is no conflict in the evidence and the terms are positively stated, so that they need only to be construed. But, though no conflict may exist in the evidence, if the intention of the parties is doubtful, the jury must determine what agreement was made.' Swanner v. Swanner, 50 Ala. 66."
Keel v. Weinman, 266 Ala. 684, 687, 98 So.2d 611, 614 (1957) (quoted as authority in MOCO, Inc. v. Gaines, 484 So.2d 470 (Ala. Civ.App.1985)).
Lindy maintains that the parties did not agree upon a procedure for payment of commissions after termination of their agreement, but that it is the custom in the industry for a manufacturer to pay commissions to a terminated manufacturer's representative only for products sold within 30 days of the termination of the parties' agreement. Lindy terminated its relationship with Twentieth Century on November 8, 1994, and continued to pay Twentieth Century through January 1995. Therefore, says Lindy, even if post-termination payment of commissions to Twentieth Century was an understood provision of the agreement, the evidence shows that Lindy complied with the industry's 30-day requirement by paying Twentieth Century through January 1995.
Russell Hayden, who now works for Lindy and who receives commissions for the Chrysler account, testified that his written agreement with Lindy provides for the payment of post-termination commissions for 30 days. However, despite Hayden's statement that the 30-day provision was "typical" in the industry, he later testified that during his initial negotiations with Lindy, he gave Lindy *1174 a standard contract form developed by the Electronics Representative Association. That contract provided for compensation of the manufacturer's representative "at the time of or after termination, for representative's efforts in developing customers in its territory which, because of representative's efforts would be likely to continue to purchase products from the manufacturer after termination." Hayden testified that when he negotiated his employment terms with Lindy, Lindy had never heard of a 30-day limit on post-termination commission payments.
Gray Allen, an independent manufacturer's representative, testified that, when he worked as a representative for Lindy, it had been his expectation that he would be paid post-termination commissions on any business he brought to Lindy. Domer Ishler testified that, unless the parties agree otherwise, a manufacturer's representative should be paid commissions on all business generated by the efforts of the representative.
As noted above, witnesses testified concerning the "custom and usage" in the industry with regard to the payment of post-termination commissions. This Court has consistently acknowledged the importance of such testimony in the proper case:
"As stated in East Tenn., Va. & Ga. R.R. Co. v. Johnston, 75 Ala. 596 (1884):
"`... Where there is an express contract, parol evidence of a usage is admissible to explain terms ambiguous or doubtful in signification, or from which to infer the intention, understanding and agreement of the parties, and to incorporate a stipulation or element, wherein the contract is silent; in such case, the usage or custom becomes a part of the contract.
"`The proper office of a custom or usage in trade is to ascertain and explain the meaning and intention of the parties to a contract, whether written or parol, which could not be done without the aid of this intrinsic evidence. It does not go beyond this, and is used as a mode of interpretation on the theory that the parties knew of its existence, and contracted with reference to it.'"
Ex parte McClarty Construction & Equipment Co., 428 So.2d 629, 633-34 (Ala.1983) (citations omitted).
"[However, no] custom or usage can prevail which conflicts with an established principle of law. And a custom or usage contrary to a statute ought not to be considered."
Mall Gift Cards, Inc. v. Wood, 288 Ala. 355, 360, 261 So.2d 31, 35 (1972) (citations omitted).
The Sales Representative's Commission Contracts Act, held by the trial court to apply here, provides:
"(a) The terms of the contract between the principal and sales representative shall determine when a commission is due.
"(b) If the time when the commission is due cannot be determined by a contract between the principal and sales representative, the past practices between the parties shall control, or if there are no past practices, the custom and usage prevalent in this state for the business that is the subject of the relationship between the parties shall control.
"(c) All commissions that are due at the time of termination of a contract between a sales representative and principal shall be paid within thirty days after the date of termination. Commissions that become due after the termination date shall be paid within thirty days after the date on which the commissions become due."
Section 8-24-2.
The statute requires that commissions "due at the time of termination" be paid within 30 days, but it also requires that commissions yet to accrue be paid within 30 days of the date on which they become due. Clearly, the statute contemplates that a sales representative is to be paid commissions that accrue on accounts that, because of his or her efforts on behalf of the principal, continue to provide business to the principal following termination of the representative. And, despite Lindy's contention to the contrary, the payment of post-termination commissions is consistent with an agreement that is terminable at the will of either party.
*1175 Twentieth Century maintains that as soon as Lindy was assured of a steady stream of business from Chrysler, and after receiving a business forecast from Chrysler showing a substantial increase in the amount of business Lindy would enjoy from Chrysler, Lindy terminated Twentieth Century, refused to pay further commissions, and simultaneously filed a declaratory judgment action seeking court approval of its actions.[2]
A Chrysler representative testified that Chrysler had projected that it could generate as much as $16 million in business for Lindy over a five-year period, and that Hill knew of these projections. In a May 1994 letter, Chrysler informed Hill of Chrysler's projection that the value of business it would give to Lindy in 1994 would be more than $3.5 million. Although Hill responded by stating that Lindy's projection for 1994 was closer to $1.5 million, she also answered a Chrysler questionnaire by indicating that Lindy could handle the higher volume of business Chrysler projected for the 1994-95 year.
The evidence supports the jury's verdict that Lindy breached its contract with Twentieth Century by refusing to pay post-termination commissions to Twentieth Century while continually receiving orders from Chrysler and despite Chrysler's communicated projections of increased orders to Lindy. The trial court correctly entered a judgment on that verdict and correctly denied Lindy's post-judgment motions to overturn it.[3]

II.
Lindy next contends that the trial court erred as a matter of law in allowing Twentieth Century to introduce evidence in support of an alleged "pattern and practice" of fraud by Lindy. The jury, however, found in favor of Lindy on Twentieth Century's claim of fraud.
"No judgment may be reversed or set aside, nor new trial granted in any civil or criminal case on the ground of misdirection of the jury, the giving or refusal of special charges or the improper admission or rejection of evidence, nor for error as to any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application is made, after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial rights of the parties."
Rule 45, Ala. R.App. P. Therefore, any error in the trial court's allowing Twentieth Century to introduce this evidence objected to by Lindy was harmless.

III.
A jury verdict that is not supported by the evidence (i.e., that is excessive or *1176 speculative) or that includes an amount not legally recoverable is flawed and must be set aside. Fraser v. Reynolds, 588 So.2d 448 (Ala.1991); Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986). Lindy claims that all three of the criteria for finding a damages verdict to be "flawed"excessive, speculative, and illegalapply here. We disagree.
Lindy first argues that the damages awarded Twentieth Century are "grossly" excessive. During its eight years of representing Lindy, Twentieth Century lost $205,000 and ultimately realized only $12,000 profit in 1994. Lindy claims that "there is nothing in the record even remotely suggesting that Twentieth Century's performance would improve in the future." According to Lindy, Twentieth Century failed to prove any lost profitspast, current, or future.
Lindy also points out that the trial court charged the jury that if it found in favor of Twentieth Century on its breach-of-contract claim, Twentieth Century would be entitled to recover damages based on the evidence of lost profits and not on the basis of gross commissions. However, says Lindy, Twentieth Century offered Chrysler's projection of the volume of business Lindy could expect to receive from Chrysler over the next five years, but omitted any evidence of what Twentieth Century's expenses and overhead would be during the same period. The evidence, says, Lindy, supported only a finding of gross commissions.
Lindy relies on the decision in Ex parte Woodward Construction & Design, Inc., 627 So.2d 393, 394 (Ala.1993):
"The method for determining the proper measure of damages on the contract was clarified by the Court of Appeals in Whiting v. Dodd, 39 Ala.App. 80, 83, 94 So.2d 411, 414 (1957), where that court held:
"`"When a plaintiff sues on a contract to recover the amount he would have received for the full performance prevented by the defendant's breach, he seeks in effect to recover as damages the profit from performance of the contract which profit defendant's breach prevented him from earning. In such a case, plaintiff has the burden of alleging and proving not only (a) what he would have received from the performance so prevented, but also (b) what such performance would have cost him (or the value to him of relief therefrom). Unless he proves both of those facts, he cannot recover as damages the profits he would have earned from full performance of the contract."'
"(Quoting Allen, Heaton & McDonald, Inc. v. Castle Farm Amusement Co., 151 Ohio St. 522, 86 N.E.2d 782, 784 (1949)). (Emphasis added.)"
Twentieth Century argues that, under the specific facts of this case, gross commissions are the same as lost profits. The damages award, according to Twentieth Century, represents accrued commissions, as well as commissions that will accrue beyond the date the agreement was terminated because Lindy will benefit in the future from the business Twentieth Century acquired for Lindy. The damages award, says Twentieth Century, represents commissions on business that will result in substantial profit to Lindy because of Twentieth Century's earlier efforts, but without Twentieth Century's having to incur future expenses on Lindy's behalf.
Twentieth Century contends that Lindy erroneously includes an amount for projected expenses for "servicing" the Lindy/Chrysler account in its discussion of future commissions to Twentieth Century. However, says Twentieth Century, the parties agreed that Lindy would pay Twentieth Century for business it obtained for Lindy. "Servicing" the account was not discussed, and Margaret Hill specifically testified that Lindy could not direct Twentieth Century in the manner in which it carried out its obligations to Lindy. Again, Twentieth Century points out that overhead and expenses would not be incurred after termination of the agreement.
Lindy next contends that the jury's award was the result of speculation and conjecture.
"The rule has long been established that the party claiming damages has the burden of establishing the existence of and amount of those damages by competent evidence. The award of damages cannot be made upon speculation, and the plaintiff *1177 has the burden of offering evidence tending to show to the required degree, the amount of damages allegedly suffered."
Johnson v. Harrison, 404 So.2d 337, 340 (Ala.1981) (citations omitted).
Here, says Lindy, there are too many contingencies in its relationship with Chrysler to support the damages award. For example, there is no guarantee that Lindy will not be placed on Chrysler's "no bid" list again, which in itself would result in a substantial diminution in the value of the projected business on which Twentieth Century claims future commissions. Further, says Lindy, Chrysler may decide to change the way it orders parts or to change the design of the parts themselves, either of which would have an effect on Lindy's business with Chrysler.
Twentieth Century presented evidence that it was only through its efforts that Lindy became one of Chrysler's suppliers, and evidence that Twentieth Century continually represented Lindy interests at Chrysler during the term of the parties' agreement. As a result, says Twentieth Century, Lindy is now one of a select group of Chrysler suppliers. According to the testimony of the Chrysler representative, under a new procurement system at Chrysler, certain suppliers are now known as "partners," and it is Chrysler's intention to maintain a steady volume of business with these suppliers. Thus, testified the Chrysler representative, as long as Lindy stays off Chrysler's "no bid list" (by promptly supplying a good product), Lindy can expect to receive constant future orders from Chrysler.
Twentieth Century also points out that the Chrysler representative testified that if a Lindy part is taken out of production (i.e., if the Chrysler vehicle in which the Lindy part is installed is no longer being produced), then a new Lindy part will be ordered for the new production. The Lindy part taken out of "production" will continue to be needed as a "service" part for the Chrysler vehicle for which it was made.
The record reveals that after Twentieth Century obtained the Chrysler account for Lindy, Lindy twice expanded its Huntsville plant in reliance, in part, on the growing and anticipated orders from Chrysler. There was evidence that Twentieth Century invested over $446,000 in developing the Chrysler account for Lindy, but that in 1994, just as Twentieth Century had reached the point of expecting a profit on the Lindy/Chrysler account, Lindy terminated its agreement with Twentieth Century.
The Chrysler representative testified that Chrysler's five-year projection for the volume of business it would give to Lindy was that the amount could be as much as $16 million. Witnesses for both parties provided evidence that the expected "life" of a part manufactured by Lindy and sold to Chrysler was three to five years. In his correspondence with Hill regarding the proposed termination of the parties' agreement, Ishler wrote, on September 12, 1994, and on November 1, 1994:
"On the existing tools and part numbers, we have earned and should be paid on any production off these tools even if, as model years change, the part numbers change. To release Chrysler as a [Lindy] house account on new business, we would expect to receive 5% for as long as the current parts are purchased by Chrysler. We get paid our standard commission which was agreed to in the beginning of our relationship[we] are paid for the business we brought to youbut you get the account for new business." (Emphasis in second added; emphasis in last sentence original.)
"You can take the account direct; but you will have to do the right thing by Twentieth Century and pay us for the tools and business which we have brought to the table as long as you reap rewards from this work."
It was not speculation by the jury that led to its conclusion that Twentieth Century's efforts on behalf of Lindy reasonably resulted in Chrysler's five-year projection for its business with Lindy.
"It is true that damages may be awarded only where they are reasonably certain. Damages may not be based upon speculation. Industrial Chemical & Fiberglass Corp. v. Chandler, 547 So.2d 812 (Ala. *1178 1988); see also Alabama Power Co. v. Alabama Public Service Commission, 267 Ala. 474, 103 So.2d 14 (1958). However, `[t]his does not mean that the plaintiff must prove damages to a mathematical certainty or measure them by a money standard. Rather, he must produce evidence tending to show the extent of damages as a matter of just and reasonable inference.' C. Gamble, Alabama Law of Damages § 7-1 (2d ed.1988), as cited in Industrial Chemical, supra, at 820. The rule that one cannot recover uncertain damages relates to the nature of the damages, and not to their extent. If the damage or loss or harm suffered is certain, the fact that the extent is uncertain does not prevent a recovery. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); see also Shook v. Vertagreen Credit Union, 460 So.2d 1343 (Ala.Civ.App.1984)."
Jamison, Money, Farmer & Co. v. Standeffer, 678 So.2d 1061, 1067 (Ala.1996) (emphasis added). See, also, Mannington Wood Floors, Inc. v. Port Epes Transp., Inc., 669 So.2d 817 (Ala.1995).
There is no question as to the nature of the damages, and there was evidence from which the jury could reasonably compute the extent of the damages award as it did. "`[W]hen there is no evidence ... of any misconduct, bias, passion, prejudice, corruption, improper motive, or cause not consistent with the truth and the facts, there is no statutory authority to invade the province of the jury in awarding compensatory damages.'" Duck Head Apparel Co. v. Hoots, 659 So.2d 897, 908 (Ala.1995) (quoting Pitt v. Century II, Inc., 631 So.2d 235, 240 (Ala. 1993)) (citations omitted).
Finally, Lindy argues that prejudgment interest is not recoverable as a matter of law, because the damages specified in § 8-24-3 do not include interest. According to Lindy, if interest "is not enumerated as a recoverable item in the statute, recovery of it is therefore precluded," citing Locklin v. Day-Glo Color Corp., 429 F.2d 873, 877 (7th Cir.1970).
The trial court charged the jury:
"With regard to the second element of damages claimed by Twentieth Century, if you are reasonably satisfied from the evidence that Twentieth Century is entitled to recover lost profits and you have arrived at the amount of your award, you should then determine from the evidence the date that Twentieth Century was entitled to the damages arrived at by you and then add interest thereto at the rate of six percent per annum from the date you find Twentieth Century was entitled to have received the damages to the present date of October 11, 1995."
Section 8-24-3 provides:
"A principal who fails to pay a commission as required by Section 8-24-2 is liable to the sales representative in a civil action for three times the damages sustained by the sales representative plus reasonable attorney's fees and court costs."
According to Lindy, the statute's silence as to the awarding of interest indicates that the legislature intended that interest not be awarded for a violation of § 8-24-1 et seq. However, as Twentieth Century points out, the Code commissioner's note to § 8-24-2 points out that § 2 of the 1994 act that amended the statute provided that the act "is cumulative to any other law providing any remedy for the recovery of commissions owed to a sales representative by a principal." Under Alabama law, prejudgment interest is available under § 8-8-8 ("Interest accrues on breach of contract"); and see Alabama Pattern Jury Instructions: Civil, § 10.18 (1993).
Lindy has shown no error in the judgment entered on the jury's verdict, or in the trial court's denial of Lindy's post-judgment motions. The judgment is due to be affirmed.
AFFIRMED.
SHORES, HOUSTON, KENNEDY, and BUTTS, JJ., concur.
MADDOX and SEE, JJ., concur specially.
HOOPER, C.J., concurs in the result.
*1179 SEE, Justice (concurring specially).
Although I concur with the main opinion, I write specially to clarify that while § 8-24-2, Ala.Code 1975, contemplates that a sales representative's commission contract may require the payment of post-termination commissions, this section does not impose such a requirement. Section 8-24-2(c) provides:
"(c) All commissions that are due at the time of termination of a contract between a sales representative and principal shall be paid within thirty days after the date of termination. Commissions that become due after the termination date shall be paid within thirty days after the date on which the commissions become due."
(Emphasis added.) This language simply means that once the objective determination is made that a sales contract provides for the payment of post-termination commissions, the agreed-upon post-termination commissions must be paid within 30 days of their due dates.
MADDOX, J., concurs.
NOTES
[1] "A principal who fails to pay a commission as required by Section 8-24-2 ["When commission is due; payment."] is liable to the sales representative in a civil action for three times the damages sustained by the sales representative plus reasonable attorney's fees and court costs."
[2] Twentieth Century contended that the conduct it alleges Lindy engaged in with regard to Twentieth Century and the Chrysler account is the type of activity in its industry that prompted the legislature to enact the Sales Representative's Commission Contracts Act as part of Alabama's commercial and consumer protection law. Indeed, in declaring that § 8-24-1 et seq. apply here, the trial court specifically held that "this is the type of case that was designed to be litigated under the Act."
[3] Although the decision in Kingsley Associates, Inc. v. Moll PlastiCrafters, Inc., 65 F.3d 498 (6th Cir.1995), is not direct authority, a footnote in Kingsley explains one method of dealing with the problem that Twentieth Century alleges exists throughout the industry:

"[The plaintiff] asserts that the use of a `life of the part' provision is a common practice in the automobile industry because the sales representative must invest a great deal of time, effort, and money in securing the initial sale. Once the initial sale is made, the buyer may continue to use the part in the manufacture of its automobiles for many years. As many of the parts manufactured by [the defendant] are functional items, such as plastic knobs, switches, and latches, the buyer may use the same part for many model years. Even after the buyer discontinues use of such part, sales will continue for repair and replacement parts. Thus, to guard against opportunistic termination, in which the manufacturer terminates the sales representative to avoid having to pay commissions on future sales, the independent sales representatives inserted `life of the part' provisions in their agreements, requiring that commissions continue to be paid despite termination."
65 F. 3d at 502. See, also, Tri-Tube, Inc. v. OEM Components, Inc., 672 So.2d 1303 (Ala.Civ. App.1995), wherein the Court of Civil Appeals approved the trial court's interpretation of the contract phrase "life of the product" in order to prevent the manufacturer's benefiting from the sales representative's efforts without compensating the sales representative for its efforts on the manufacturer's behalf.