MURDOCK, Justice.
Intergraph Corporation and its subsidiaries (“Intergraph”) appeal from a judgment of the Madison Circuit Court in its declaratory-judgment action against Bentley Systems Incorporated and Bentley Systems Europe B.V. (“Bentley”). Bentley cross-appeals from the Madison Circuit Court’s disposition of its breach-of-contract counterclaim against Intergraph. In both the appeal and the cross-appeal, we affirm in part and reverse in part.

I. Facts and Procedural History

This is the second time this complex case has come before this Court for disposition. In the first appeal, Bentley Systems, Inc. v. Intergraph Corp., 922 So.2d 61 (Ala.2005) (“Bentley I”), we reversed the trial court’s judgment and remanded the case, ordering that live testimony was required to resolve several disputed issues and suggesting that the trial court appoint a special master to preside over the new proceeding. Because a detailed summary of the background to this dispute was provided in Bentley I, we quote extensively from that opinion at the outset, and we use the terms defined therein as defined terms in this opinion:
“Bentley and Intergraph entered into an asset purchase agreement (‘the APA’) whereby Bentley purchased three software product lines from Intergraph. The product lines, known as the Civil, Raster, and Plotting (hereinafter referred to as ‘CRP’) products, are software applications used by architects and engineers to prepare documents such as diagrams and blueprints. In conjunction with the sale, Bentley executed a promissory note in favor of Intergraph that was subject to future adjustments based upon the amount of certain revenues generated from the CRP products.
“In addition to the CRP products, In-tergraph transferred to Bentley a portfolio of maintenance agreements with its CRP customers and the exclusive right to convert those Intergraph agreements to maintenance agreements with Bentley. Maintenance agreements entitle users to product support and free upgrades. For products like the CRP products, which are geared to profes *67 sionals, maintenance agreements represent an important recurring stream of revenue for software companies like Bentley and Intergraph.”

“B. The Partners

“Bentley Systems is a Delaware corporation; its principal place of business is in Exton, Pennsylvania. It is the parent corporation of Bentley Systems Europe, a Netherlands corporation and the principal subsidiary through which Bentley does business in foreign countries. According to the facts stipulated to by the parties, ‘Bentley is a developer of professional software products that it licenses to architects and engineers to design buildings and other public projects.’ Bentley’s principal product is MicroStation, a computer-aided design software program. Many of Bentley’s other software products, including most of the CRP products acquired from In-tergraph, require MicroStation in order to operate.
“Intergraph Corporation is a Delaware corporation; its principal place of business is in Huntsville, Alabama. In-tergraph Corporation is the parent corporation of [several foreign subsidiaries]. According to the parties’ stipulated facts, ‘Intergraph’s business includes providing technical software products for process and power, utilities, communications, mapping and geographical information systems, photogrammetry, and public safety.’ In essence, Inter-graph provides software for various technology-intensive industries.

“C. The APA

“In November 1999, Intergraph and Bentley first discussed the sale of Inter-graph’s CRP products to Bentley. Because most of Intergraph’s CRP products run on Bentley’s MicroStation, the majority of Intergraph’s CRP users were also existing Bentley customers, and the parties were confident that Bentley would be able to acquire substantially all of the CRP maintenance income stream within the year following the closing on the sale.
“After signing a letter of intent on April 20, 2000, negotiating the terms of the contract for several months, and postponing the closing several times, the parties closed Bentley’s purchase of the CRP products and maintenance agreements from Intergraph with the execution of the APA on December 26, 2000. Intergraph represented in the APA that of the $34 million in total revenue from its CRP products in 1999, $20 million was derived from maintenance on the products. The purchase price for the CRP products consisted of (1) a cash payment by Bentley in the amount of $13,462,728; and (2) a promissory note executed by Bentley dated as of December 1, 2000. The amount of the cash payment is not at issue in this case. The note was given a preliminary value of $11,087,112 at the time of the closing and was to be adjusted based upon Bentley’s success in transitioning the In-tergraph maintenance agreements to Bentley’s maintenance program called SELECT.
“At the closing, Intergraph transferred all of its property rights in the CRP products to Bentley. All authority to sell new licenses for CRP products and to enter into new maintenance agreements on CRP products belonged solely to Bentley. Bentley hired 88 In-tergraph employees, who were principally dedicated to the CRP products. Under the APA, Bentley actually provided the services under the maintenance agreements Intergraph had with the customer until each agreement expired or was due to be renewed. The APA *68 was structured to provide for an orderly transition of the maintenance agreements on the CRP products from Inter-graph to Bentley as the agreements expired or came up for renewal during the one-year period following December 1, 2000 (‘the APA year’). The maintenance agreements for the CRP products were scheduled to expire in increments during each month of the APA year. After the closing, the APA required the parties to act jointly to solicit and encourage customers to renew their maintenance agreements solely with Bentley. The APA also required Intergraph to provide Bentley with detailed data regarding the maintenance agreements and to update that data at certain specific intervals.
“Almost immediately after the closing, however, difficulties in complying with the provisions of the APA became apparent. Intergraph had difficulty compiling the data it had committed to provide to Bentley. Bentley discovered that much of the data Intergraph provided it was incomplete and/or inaccurate, a problem compounded when the data in the various updates furnished by Intergraph changed from submission to submission. In fact, the changes were so extensive that Intergraph never complied with a requirement in the APA that all changes in the updated data submissions be clearly marked. Furthermore, after the closing date, Inter-graph, for its own account, continued to renew maintenance agreements on CRP products in the United States and in Europe. During 2001, Intergraph provided Bentley with lists of contracts In-tergraph had renewed in the United States during the year, and paid Bentley 100% of the revenues it had collected on certain of those contracts that renewed during 2001. In April 2001, Bentley organized a CRP task force to address some of the foregoing problems. The goal of the CRP task force was to significantly increase the amount of new and renewed SELECT subscriptions for CRP products.

“D. The Promisso'ry Note

“The gravamen of this dispute is the calculation of the amount due under the promissory note. The value of the note as adjusted depended upon the calculation of what the APA refers to as transferred maintenance revenues (‘TMR’) and renewed maintenance revenues (‘RMR’). Both TMR and RMR are defined terms under the APA, together with the corresponding note adjustments called for by the APA. TMR represented the revenues accruing [during the APA year] from the maintenance agreements while those agreements were still in Intergraph’s name. RMR represented the revenues accruing from the maintenance agreements [during the APA year] after those agreements were renewed by Bentley.
“The calculation of TMR, according to section 7.1 of the APA, was based upon a schedule of transferred CRP maintenance agreements (‘the TM schedule’) furnished by Intergraph at the time of closing. The TM schedule Intergraph furnished when the APA was executed purported to provide Bentley with a list of all CRP maintenance agreements in effect in the United States as of October 31, 2000, and outside the United States as of July 31, 2000, ‘specifying without limitation, the products covered thereunder, the remaining terms thereof and the Maintenance Agreements that are scheduled to expire on or before the MCO Date.’ The TM schedule contained a projection of anticipated revenue for the 12 months following the closing. Multiplying this amount times *69 1.5 established the preliminary value of the note at closing at $11,087,112. Bentley began making monthly payments to Intergraph based upon that preliminary value.
“After the closing, the APA required Intergraph to update the TM schedule to list all maintenance agreements in effect as of December 1, 2000, the maintenance cutoff date (‘the MCO date’). This update was to occur in two steps, the first within 50 days of closing and the second within 150 days of closing. The APA required Bentley to adjust the note, retroactively to December 1, 2000, to reflect the total revenues listed on the 50- and 150-day updated TM schedules. Bentley was required to adjust the note on the 8-, 6-, and 14-month anniversaries of the MCO date. The first adjustment to the note was to occur on March 1, 2001, two weeks following the scheduled date for Intergraph’s submission of the 50-day updated TM schedule, at which time the note was to be increased to 1.5 times the TMR shown on the 50-day update. The second adjustment to the note was to occur on June 1, 2001, one week following the scheduled date for Intergraph’s submission of the 150-day updated TM schedule, at which time the value of the note was to be increased to 1.5 times the TMR shown on the 150-day update. The final adjustment to the note was to occur on February 1, 2002, at which time the value of the note was to be increased to 1.5 times the RMR.
“Intergraph’s 50-day updated TM schedule was due on February 14, 2001. On that date, Intergraph provided maintenance data for the Intergraph European subsidiaries directly to Bentley Systems Europe. Intergraph did not deliver the 50-day updated TM schedule to Bentley’s corporate office in Pennsylvania until March 28, 2001. Based upon this data, Bentley increased the principal value of the note to $14,863,218 and also increased the amount of its monthly payments to Intergraph.
“Intergraph’s 150-day updated TM schedule was due on May 25, 2001. On that date, Intergraph again provided maintenance data for the Intergraph European subsidiaries directly to Bentley Systems Europe. Intergraph did not deliver the 150-day updated TM schedule to Bentley’s corporate office in Pennsylvania on May 25, 2001, but instead, provided various files to Bentley throughout June and July. On July 26, 2001, Intergraph e-mailed maintenance data for the Asia-Pacific region to Bentley’s corporate office. The updated schedules provided by Intergraph changed information about some of the maintenance agreements already on the schedule, including the ending dates of some of those agreements.
[[Image here]]
“Various negotiations ensued. As a result of those negotiations, Intergraph submitted additional data to Bentley through October 2001. Bentley increased the principal value of the note in October 2001. On or about January 24, 2002, Bentley proposed a final note value of $21,214,808, calculated by multiplying 1.5 times TMR of $9,465,076 and 1.5 times RMR of $4,678,129 and adding the results. According to Intergraph, Bentley based its computation on a set of rules it had unilaterally constructed, which Intergraph says do not comply with the APA. According to Bentley, it was necessary to construct such rules to address situations not contemplated by the APA. Although Intergraph objected to the proposed note value of $21,214,808, contending that Bentley had suppressed the value of the note by approximately $3.05 million, Bentley began making monthly payments based *70 upon its proposed final note adjustment. Bentley stopped, making payments on the note in March 2003.

“E. Procedural History

“Intergraph Corporation sued Bentley Systems in December 2002, seeking (1) a declaration of the principal value of the note, (2) a declaration of the amount owed by Bentley on the note, and (3) indemnification for litigation costs as provided under the APA. Bentley then filed a counterclaim against Intergraph alleging breaches of the APA. Bentley contended (1) that Intergraph failed to submit data updates required by the APA in a timely fashion, (2) that the data when submitted was incomplete and inaccurate, and (3) that Intergraph renewed CRP maintenance agreements for its own account. Bentley also sought indemnification for litigation costs as provided under the APA.
“At the trial court’s suggestion, the parties agreed to submit the case to the trial court on stipulations, depositions, and exhibits. The trial court heard oral argument from counsel on May 11, 2004, and announced its decision upon the conclusion of the argument. The trial court entered a judgment declaring that Bentley’s calculation of the note principal, interest, and amount owed was correct. The trial court established the value of the note at $21,152,378 and concluded that Bentley owed Intergraph a balance of $7,539,944 on the note, allocating $6,769,934 to unpaid principal and $770,010 to accrued and unpaid interest. The trial court found in favor of Inter-graph on Bentley’s counterclaim. The trial court also awarded Intergraph and Bentley their respective litigation costs. Because Intergraph’s legal expenses exceeded Bentley’s legal expenses by $409,282.72, the trial court awarded the amount of the difference to Intergraph. The trial court entered a final judgment in favor of Intergraph on May 12, 2004.”
Bentley I, 922 So.2d at 65-68 (footnote omitted).
Both parties appealed the trial court’s original judgment. During the pendency of the appeal, Bentley paid Intergraph $7,970.203.72.[1]
In Bentley I, this Court examined the parties’ claims and the trial court’s conclusions in detail. It settled some issues, but determined that other issues could not be disposed of without live testimony and further exploration at the trial court level.[2] Concerning Intergraph’s claims regarding the principal value of the promissory note, this Court concluded:
“After reading the reports and depositions of both experts, [Lester] Alexander [Intergraph’s expert] and [Dana] North-cut [Bentley’s expert], we conclude that we cannot accept either calculation in its entirety. Neither expert adequately explained his theories and methodology in the case; therefore, we find neither’s conclusions reliable. The APA provides significant guidance that allows us to make certain conclusions, but after reviewing all of the evidence before us, we find ourselves unable to resolve all of the competing arguments in this case.”
922 So.2d at 81. Consequently, this Court “reversefd] the judgment insofar as it held that Bentley’s calculations of the value of the promissory note were correct” and “remand[ed] the case with directions to the *71 trial court to take steps necessary to resolve the disputed issues and then to calculate the note principal in accordance with the guidelines” provided in Bentley I. 922 So.2d at 84. The Court noted that “[t]he trial court’s use of a special master experienced in such calculations and transactions and capable of navigating the extensive databases used in this case would certainly be warranted.” Id.
Regarding Bentley’s counterclaim against Intergraph, this Court concluded that Intergraph had breached the APA by providing Bentley with bad and late CRP-maintenance-agreement data, and by “renewing] CRP maintenance agreements in violation of what this Court considers to be a plain and unambiguous provision in the APA that flatly prohibits such renewals on Intergraph’s part.” 922 So.2d at 91. These breaches of the APA by Intergraph resulted in lost profits for Bentley because of delays in the renewal of, or nonrenewal of, maintenance contracts. The Court then explained:
“The difficulty in this case comes not from determining whether Intergraph breached the contract, but from determining questions such as to what extent did the breach occur, to what extent was Bentley damaged thereby, to what extent did Bentley’s own actions contribute to the harm it suffered, and to what extent was Bentley able to mitigate its damages. As to those questions, the record reflects sharp factual disputes that we cannot resolve on a cold record consistent with our obligation to render a ‘just’ judgment. § 12-2-7(1), Ala. Code 1975.”
922 So.2d at 92. Accordingly, the Court “reverse[d] the judgment insofar as the trial court held in Intergraph’s favor on Bentley’s counterclaim,” but it again remanded with directions for the trial court to “take steps necessary to resolve the disputed issues and then to calculate the damages Bentley sustained as a result of Intergraph’s breach of contract in accordance with the guidelines set out above, using a special master in this aspect of the case, if necessary....” 922 So.2d at 93.
Because of the nature of its disposition of the case, the Bentley I Court set aside the attorney-fee award for reconsideration by the trial court at the close of the proceedings on remand.
On remand, the trial court referred all disputed issues to a special master. The special master conducted proceedings in three separate phases and heard live testimony from a number of witnesses. The special master submitted a report[3] in which he concluded that the principal value of the promissory note (“the note”) should be adjusted to $22,295,456; counting payments already made and cash adjustments awarded to Intergraph, the special master determined that Bentley owed Intergraph an additional $1,539,744, including $500,000 in retroactive interest, on the note. The special master awarded Bentley $2,226,486 on its breach-of-contract counterclaim for lost profits. He concluded that Intergraph was entitled to indemnification from Bentley for legal expenses totaling $6,636,144.20; he concluded that Bentley was entitled to indemnification from Inter-graph for legal expenses totaling $5,731,077.98. The net result of all the special master’s rulings was that, on balance, Bentley must pay Intergraph $279,733.
After the special master submitted his findings to the trial court, the trial court *72 held a hearing pursuant to Rule 58(e)(2), Ala. R. Civ. P.[4] Thereafter, the trial court issued an order providing an explanation for overruling the parties’ objections to the special master’s report and adopting the special master’s findings of fact and conclusions of law. Intergraph appealed the judgment to this Court, and Bentley cross-appealed.[5]

II. Standard of Review

“[A] court accepts a master’s findings of fact in non-jury actions unless clearly erroneous; and to the extent the trial court has adopted the findings of a master, this same standard applies to an appellate review of these findings. Rule 58(e)(2), Ala. R. Civ. P., and committee comments to Rule 53, Rule 52, Ala. R. Civ. P., and committee comments to Rule 52. In essence, a master’s report is accorded the same weight as a jury verdict and, therefore, is not to be disturbed unless it is palpably and plainly wrong. Patterson v. Lovelady, 233 Ala. 554, 556, 172 So. 646, 648 (1937).”
Burgess Mining & Constr. Corp. v. Lees, 440 So.2d 321, 327 (Ala.1983) (emphasis omitted).

III. Analysis

A. Intergraph’s Assignments of Error

(1) Intergraph’s Arguments Concerning the Award of Damages to Bentley
Intergraph contends that the trial court committed several errors by adopting the special master’s findings of fact and conclusions of law. The majority of its arguments pertains to the award of damages to Bentley on its counterclaim for lost profits resulting from Intergraph’s breaches of the APA.
Intergraph first contends that the special master was precluded from awarding damages on Bentley’s counterclaim because, it says, Bentley failed to follow this Court’s command in Bentley I that it provide additional testimony explaining the basis and methodology of its expert’s damages calculation. Intergraph argues that this Court specifically found the explanation of the damages calculation of Bentley’s accounting expert, Dana Northcut, to be unreliable and insufficient to support an award of lost profits. Because, Inter-graph says, Bentley provided no new explanation of Northcut’s damages model or methodology on remand, Northcut’s calculation remains unreliable and insufficient to support a damages award. Consequently, Intergraph contends, the special master erred in relying upon Northcut’s calculation of the damages Bentley sustained as a result of Intergraph’s breaches of the APA.
In Bentley I, this Court stated that “[njeither expert adequately explained his theories and methodology in the case; therefore, we find neither’s conclusions reliable.” 922 So.2d at 81. It added that “Northcut ... did not sufficiently explain the basis for his damages calculation in his deposition to allow us to accept his report without additional explanatory live testimony. [Lester] Alexander’s [Intergraph’s *73 expert] criticism of Bentley’s damages calculation is likewise insufficient without additional explanatory live testimony.” Id. at 93. On remand, Bentley was unable to present live testimony from Northcut because he died of cancer in February 2007 before additional testimony was heard in this case. Instead, Bentley presented 3.5 hours of Northcut’s videotaped deposition testimony to the special master, and Inter-graph presented 1.5 hours of his videotaped testimony in rebuttal.
The special master stated that North-cut’s videotaped deposition permitted him to evaluate Northcut’s credibility, something not possible with the previous deposition testimony submitted in the form of a transcript. He also noted that he heard live testimony from Bentley executives Greg Bentley, Malcolm Walter, and David Nation, who offered explanatory testimony concerning “certain factual elements of the damages theory.” For example, they testified that, based on their previous experience with maintenance contracts on similar products, they expected to be able within the APA year to enter into contracts retaining all Intergraph’s maintenance customers. Robert Hewitt, the data analyst responsible for calculating the value of the note, testified that, as to maintenance contracts eventually obtained by Bentley, it was able to retain 98% of them during the ensuing two years, thus providing concrete evidence for Bentley’s expectations.
In addition, Hewitt testified about the data Bentley used to calculate the note. The special master permitted Hewitt to testify “with respect to lower level data and calculations used in Prof. Northcut’s model” but concluded that Hewitt did not qualify as an expert with respect to “the underlying ‘but for’ damage theory.” The special master found that Hewitt properly updated Northcut’s damages model within his area of expertise.[6] The special master concluded that Northcut’s videotaped deposition testimony together with the testimony of these other Bentley witnesses fulfilled this Court’s requirement in Bentley I for “additional explanatory live testimony” to explain the theory and methodology behind Northcut’s damages calculation.
It is true that this Court was not so much concerned with Northcut’s credibility as a witness as it was that Bentley’s lost-profits damages theory and methodology be adequately explained. In this regard, as noted, a substantial amount of videotaped deposition testimony by Northcut was introduced, and testimony from Bentley executives provided further explanation with regard to the damages theory. Hewitt’s testimony provided some updating and elaboration on Northcut’s methodology.
Moreover, it is notable that the special master also spent considerable time examining Northcut’s report in detail, and concluded that, within certain strictures, Northcut’s methodology was sound. This Court observed in Bentley I that assigning a special master in this case would be helpful because a special master would be “experienced in such calculations and transactions and capable of navigating the extensive databases used in this case....” 922 So.2d at 84. Both parties agreed that the special master was well qualified to *74 hear the financial issues that are central to the parties’ dispute in this case.
In sum, we conclude that the further testimony provided by Bentley’s other witnesses and the special master’s in-depth examination of Northcut’s report met the requirement set out by this Court in Bentley I that Bentley adequately explain its damages calculation.
Intergraph next argues that neither Bentley’s expert nor its executives established the fact of damages. With respect to Northcut, Intergraph asserts that “certainty in the fact of damages is essential,” Palmer v. Connecticut Ry. & Lighting Co., 811 U.S. 544, 561, 61 S.Ct. 379, 85 L.Ed. 336 (1941), and it contends that Northcut assumed damages because he insisted that customer data was “fundamental” to the transaction at issue. Northcut used a “but for” theory in calculating Bentley’s damages, meaning that he assumed Bentley would be able to renew the vast majority of the CRP maintenance agreements “but for” Intergraph’s breaches of the APA relating to the provision of customer data and the renewal of customer contracts. He calculated Bentley’s losses during the APA year and the ensuing four years based on Bentley’s inability to renew those agreements during the APA year. Intergraph essentially complains that Northcut’s methodology assumed damages without any specific customer-by-customer evidence to support such damages.
We find Intergraph’s argument unpersuasive. The fact that Northcut testified that data was “fundamental” and that damages could be established “by simple inference” does not mean that damages were assumed. It simply means that damages were an obvious result of Inter-graph’s behavior because customer data was vital to retaining the CRP maintenance agreements. As Northcut testified, there is “a direct link between the information provided through this transaction and Bentley’s ability to transition these CRP seats to Bentley maintenance.” Moreover, it is not surprising that Bentley did not base its calculation on actual customer responses because customers were not likely to know the reason behind Bentley’s failure to contact them. Furthermore, Intergraph fails to provide any authority stating that customer-by-customer, or transaction-by-transaction, evidence is required to establish damages in a situation involving lost profits, especially on such a large scale. In fact, several cases have held that it is not.
In Lindy Manufacturing Co. v. Twentieth Century Marketing, Inc., 706 So.2d 1169 (Ala.1997), for example, this Court concluded that a jury’s award of lost profits to an independent manufacturer’s representative was not speculative because the independent manufacturer established that securing a particular client for the company would mean “a steady volume of business” from the client in the future. 706 So.2d at 1177. Because it was a foregone conclusion that the company would reap future profits from the client secured by the independent manufacturer’s representative, the inability to determine the exact amount of damages did not preclude the award of such damages. See 706 So.2d at 1178. Likewise, in Mason & Dixon Lines, Inc. v. Byrd, 601 So.2d 68 (Ala.1992), this Court determined that a trucking company’s agent had sufficiently established the fact of damages through evidence of the agent’s past profits earned working with a similar company and his potential earning power. See also General Auto Parts Co. v. Genuine Parts Co., 132 Idaho 849, 979 P.2d 1207, 1217-18 (1999) (stating that the testimony of the plaintiffs economic expert that “actual sales from 1992 through 1996 were significantly lower *75 than what sales should have been for that time period” was an “acceptable approach” to establishing damages).
Greg Bentley, Bentley’s president and chief executive officer, specifically testified that Bentley had every confidence that it would “renew virtually all of the Inter-graph maintenance book of business for CRP under our Bentley Select program” in a seamless fashion but that this did not happen because of the bad and late data provided by Intergraph, as well as Inter-graph’s improper renewal of some maintenance contracts. He also testified that the delay in renewals was a “natural consequence” of bad or late data because one “can only sell a maintenance contract for CRP software to someone who is a due licensee when I know who he is and where he is, and if I don’t know that I can’t begin the process of rolling over a maintenance contract.” He stated that there was no other cause for the delay because Bentley “did not suffer any such problems with renewing and continuing our maintenance coverage on our other products, including those for which the characteristics of the products and the characteristics of the users are as comparable as can be to the CRP products.” Bentley’s chief operating officer, Malcolm Walter, testified that Bentley expected to convert all the CRP maintenance contracts because all the customers for the CRP products were already Bentley customers. He also testified that renewal rates for maintenance contracts drop after the expiration date of the contract, so it is vital to begin the renewal process before the contract expires. He further testified that Intergraph’s breaches had a “significant impact” on Bentley’s ability to timely renew the CRP maintenance contracts. Even one of Intergraph’s own witnesses testified that “it’s very important that you not have any interruption in the maintenance renewal process.”
Through this and other testimony, Bentley established that its MicroStation product was required to run most of the CRP products acquired from Intergraph, that it renewed a high percentage of its own software-maintenance agreements that are similar to the CRP maintenance agreements, and that, as to the CRP maintenance agreements Bentley was able to renew in its name, it thereafter retained them at about a 98% annual renewal rate. Bentley also established that Intergraph’s errors in providing Bentley with information on the CRP maintenance agreements were the most likely cause of its initial lost profits because it demonstrated that renewal delays were an unexpected occurrence, given the products involved and the history of renewals on such maintenance contracts. As with the cases mentioned above, these facts concerning past performance and the likelihood of similar future results established with sufficient certainty that CRP maintenance agreements would have been renewed but for Inter-graph’s breaches of the APA, which in turn established the fact of lost profits for Bentley.
Intergraph also contends that even if Bentley demonstrated the fact of damages, it did not prove the award of $2,226,486 in lost profits with reasonable certainty. This Court has observed:
“ ‘[T]he loss of profits must be the natural and proximate, or direct result of the breach complained of and they must also be capable of ascertainment with reasonable, or sufficient, certainty, or there must be some basis on which a reasonable estimate of the amount of the profit can be made; absolute certainty is not called for or required.’ ”
Mason & Dixon Lines, 601 So.2d at 70 (quoting Paris v. Buckner Feed Mill, Inc., 279 Ala. 148, 149-50, 182 So.2d 880, 881 (1966)). Intergraph argues that Bentley *76 failed to prove its damages with reasonable certainty for several reasons.
First and foremost, Intergraph contends that Bentley did not account for other causes for its failed renewals. Echoing its first argument regarding the fact of damages, Intergraph says that Northcut assumed that the sole cause of Bentley’s lost profits was Bentley’s failure to renew some of Intergraph’s maintenance contracts. According to Northcut, this failure was attributable to bad data, late data, or improper renewals by Intergraph. Inter-graph argues that Northcut failed to account for other potential causes of lost profits. Specifically, Intergraph lists eight other potential causes for Bentley’s lost profits: (1) some customers stopped using the CRP products/software; (2) some customers went out of business; (3) some customers simply were not interested; (4) some customers refused to pay the higher prices Bentley was charging; (5) some customers did not like Bentley’s “cover all” policy, which required customers to buy maintenance for all of their Bentley products; (6) some customers believed Bentley’s maintenance support was inferior; (7) the timing of the transaction (Christmas holidays) was problematic for some customers; and (8) Bentley lacked the security clearance required to service some customers.
Bentley insists that these causes were accounted for by Northcut’s benchmarks in his damages calculation. For example, Northcut assumed that some customers would go out of business or otherwise decide not to continue them maintenance contracts by allowing for some erosion in the subscription base over time. Regarding difference in pricing, Intergraph’s own accounting expert, Denise Dauphin, admitted that on average the difference was negligible and that she had not performed a price analysis.
The special master concluded that Northcut’s “but for” damages model was accurate with regard to the facts and circumstances as they existed during the APA year.[7] In essence, the special master concluded that Bentley proved its lost-profits damages with reasonable cei'tainty for the first year of the APA.
“[A] plaintiff attempting to establish damages in a breach of contract action need only ‘“lay a foundation which will enable the trier of the facts to make a fair and reasonable estimate of the amount of damage.” ’ ” Mason & Dixon Lines, 601 So.2d at 70-71 (quoting United Bonding Ins. Co. v. W.S. Newell, Inc., 285 Ala. 371, 380, 232 So.2d 616, 624 (1969), quoting in turn 22 Am. Jur.2d Damages § 25). As noted, our law requires that proof of lost profits be shown with “ ‘reasonable, or sufficient, certainty ...; absolute certainty is not called for or required.’” Mason & Dixon Lines, 601 So.2d at 70. As a corollary, cases applying the “reasonable certainty” standard have rejected imposing a burden on the plaintiff in the first instance to prove negatives, i.e., to exclude every conceivable cause for its lost profits. As *77 the court explained in Fontana Aviation, Inc. v. Beech Aircraft Corp., 432 F.2d 1080 (7th Cir.1970),
“[i]f there were other possible causes of plaintiffs inability to sell new Beech airplanes to the apparently sound prospects, it would appear that the defendants were under obligation to go forward with evidence to that effect and Fontana ‘was not required in the first instance to prove the absence of all other conceivable causes.’ ”
432 F.2d at 1087 (quoting American Cooperative Serum Ass’n v. Anchor Serum Co., 153 F.2d 907, 912 (7th Cir.1946) (emphasis added)).
Similarly, in Corson v. Universal Door Systems, Inc., 596 So.2d 565 (Ala.1991), this Court discussed the burden of proof concerning lost profits and other possible causes for the loss, stating:
“Universal would be entitled to nominal damages for breach of the nonsolicitation covenant upon mere proof that Cor-son successfully solicited a Universal customer. However, in order to collect more than nominal damages, Universal must also prove that it actually lost money because of Corson’s breach, that is, that it would have gotten the business that went to Alabama Door. It follows that if Corson could demonstrate other reasons that might have accounted for Universal’s alleged loss of business since Corson’s termination, Universal’s burden of proof on the issues of causation and damages would become more substantial.”
596 So.2d at 570 (citation omitted).[8]
As the special master found and as we have concluded, Bentley presented reliable proof of its lost profits for the APA year. As we indicated in Corson, Intergraph then had the burden of introducing, or going forward with, evidence indicating that “other causes” accounted for Bentley’s lost profits. Yet Intergraph’s accounting expert, Dauphin, repeatedly stated that she did not analyze the possible effects of Intergraph’s suggested “other causes” for Bentley’s lost profits. On the record before us, we cannot conclude that Intergraph introduced sufficient evidence to impose on Bentley the “more substantial” burden of negating each of the alternative causes suggested by Intergraph.
Intergraph also contends that the special master’s lost-profits award to Bentley failed to account for the claim that Bentley abandoned. Specifically, Intergraph observes that Northcut based his damages calculation on four breaches: bad data, late data, improper renewals, and lack of cooperation by Intergraph. Intergraph contends that Bentley abandoned its claim of lack of cooperation in the first appeal to this Court. This Court in Bentley I noted:
“To the extent that Bentley attempts to incorporate its arguments as to a fourth breach of the APA by Intergraph by reference to its trial brief, we reject any such incorporation. Incorporation into an appellate brief of arguments made in a trial brief is not proper procedure under Rule 28, Ala. R.App. P. We therefore do not consider Bentley’s claim that Intergraph breached the APA by its alleged failure to cooperate.”
922 So.2d at 85 n. 8 (citations omitted). Because Bentley waived its argument concerning Intergraph’s lack of cooperation, Intergraph argues that Northcut’s “lump sum” damages calculation must be rejected because it takes into account Intergraph’s alleged lack of cooperation.
*78 Bentley responds by stating that this Court in Bentley I remanded the case for consideration of “all disputed issues,” which, Bentley says, included the lack-of-cooperation claim. That is not exactly what this Court said. The Court found that “Intergraph breached the APA,” and accordingly it “reverse[d] the judgment insofar as the trial court held in Intergraph’s favor on Bentley’s counterclaim” and “re-mandad] the case with directions to the trial court to take steps necessary to resolve the disputed issues and then to calculate the damages Bentley sustained as a result of Intergraph’s breach of contract in accordance with the guidelines set out above.... ” Bentley I, 922 So.2d at 93 (emphasis added). The emphasized language indicates that because the Court did not consider Bentley’s lack-of-cooperation claim, the trial court was not supposed to calculate damages based on that claim.
The special master performed his duties in conformity with our mandate; his findings pertaining to the cause of Bentley’s lost profits focused on “the incompleteness of the data [provided by Intergraph], the inaccuracies and inconsistencies in the data [provided by Intergraph], and Intergraph’s improper renewals,” which he concluded “turned Bentley’s conversion effort into a chaotic process.” The special master concluded that Northcut’s damages model captured the lost profits in the first year of the agreement that resulted from these breaches by Intergraph. No mention is made by the special master of Bentley’s claim of lack of cooperation. Even if he had mentioned it, however, lack of cooperation is implicit in Intergraph’s failure to provide accurate data and to provide it in a timely manner, as well as in its improper renewal of maintenance contracts after the APA had been executed, and there is no reason to believe that Northcut would have altered his damages calculation if he had eliminated Bentley’s general claim of lack of cooperation on Intergraph’s part.
Intergraph’s final argument concerning the award of lost profits to Bentley is that the special master failed to include necessary “costs” in his lost-profits calculation. Intergraph notes that any lost-profits calculation must consider the costs associated with the lost revenue to arrive at a proper estimate of lost profits. As this Court has observed, in a lost-profits action the
“ ‘ “plaintiff has the burden of alleging and proving not only (a) what he would have received from the performance so prevented, but also (b) what such performance would have cost him (or the value to him of relief therefrom). Unless he proves both of those facts, he cannot recover as damages the profits he would have earned from full performance of the contract.” ’ ”
Ex parte Woodward Constr. & Design, Inc., 627 So.2d 393, 394 (Ala.1993) (quoting Allen, Heaton & McDonald, Inc. v. Castle Farm Amusement Co., 151 Ohio St. 522, 86 N.E.2d 782, 784 (1949) (emphasis omitted)).
Intergraph observes that the APA required Bentley to increase the principal value of the note to account for CRP maintenance agreements Bentley successfully renewed during the APA year. Inter-graph contends that Northcut included in his lost-profits calculation an offset for the increase in the principal value of the note Bentley would have had to make if Bentley had been able within the APA year to renew the CRP maintenance agreements upon which its lost-profits claim was based. The special master adopted North-cut’s method of calculating lost profits during the APA year, but he did not include Northcut’s increased note cost adjustment in his calculation of lost profits. According to Intergraph, the result is that the special *79 master awarded Bentley lost revenues, not lost profits. We agree.
As Woodward Construction makes clear, a lost-profits calculation must include both the revenue lost as a result of a party’s breach of the contract and what it would have cost the injured party if the contract had been performed without the breach. If Bentley had renewed the CRP maintenance contracts in question within the APA year, it would have had to increase the principal value of the note by a corresponding amount. This is a definite cost to be subtracted from lost revenues. The special master’s calculation did not include that cost, thus making the award one for lost revenues, as Intergraph contends. Accordingly, we must reverse this portion of the trial court’s decision, and remand the case for a determination of the proper amount of the cost that should be subtracted from Bentley’s damages award.
(2) Intergraph’s Arguments Concerning the Amount Bentley Owes Inter-graph on the Promissory Note
The special master concluded that Bentley owed Intergraph an additional $1,539,744 on the note. Intergraph argues that it is entitled to a higher amount for two reasons. First, it contends that the special master’s calculation erroneously excluded revenues associated with “evergreen” agreements in the United Kingdom (“U.K.”). Second, it contends that Bentley did not meet its burden of establishing that it was entitled to a cash adjustment of $297,837 for “other invoices.”
Concerning the revenue exclusion related to U.K. CRP maintenance agreements, the special master concluded that Intergraph did not “sustain[ ] its burden of proof of establishing that the U.K. contracts are ‘evergreen contracts’ within the definition established by the Supreme Court.” Intergraph contends that this was an erroneous conclusion for two reasons. First, it contends that the plain language of those contracts demonstrates that they were evergreen agreements. Specifically, it quotes the following language from those agreements:
“This contract will continue in full force until terminated in one of the following ways:
“Either Party provides to the other written notice of intent of termination. This Contract shall terminate three months after receipt of the notice, or at such times as is mutually agreed in writing.”
Second, Intergraph notes that its business-operations manager, Ian Buswell, testified that every single maintenance agreement in the U.K. was an evergreen agreement.
This Court in Bentley I defined an “evergreen” contract as
“one that has no definite term. Instead of lasting a finite period ... an evergreen maintenance agreement does not renew, but continues until such time as one party takes affirmative action to terminate it. A typical evergreen contract can be terminated by either party’s complying with a contractual notice provision, normally three months’ notice.”
Bentley I, 922 So.2d at 75-76.
A review of the testimony and documents presented to the special master on this issue shows conflicting evidence. The agreement Intergraph used as the example for all of its U.K. CRP agreements, and from which the above-quoted contract language was taken, was an agreement with Alstom Energy. It contained a “Contract Period” from April 1, 2001, to March 31, 2002. It also stated that it was a contract “Quotation,” indicating that the contract did not take effect until the quotation of terms was accepted. The U.K. agreements also were assigned new con *80 tract numbers each year by Intergraph. These are not characteristics of an evergreen contract. Intergraph’s database documentation on the U.K. CRP agreements seemed to confirm this, because it stated that the U.K. agreements were not evergreen contracts. Moreover, though the language Intergraph quotes to demonstrate that the U.K. CRP maintenance agreements are evergreen contracts is allegedly from the standard terms-and-conditions contract, Intergraph did not present evidence indicating that those terms were in effect at the time the quotation was signed or that those terms were intended to be incorporated into the Alstom Energy agreement.
On the other hand, Dauphin, Inter-graph’s accounting expert, concluded that the Astom Energy agreement was an evergreen contract because it states that it is a “standard service” contract, and Buswell had testified that Intergraph’s standard U.K. contract was an evergreen contract. Aso, Dauphin understood the “Contract Period” to mean the period during which modifications in the price could not be made, not that the contract itself expired at the end of the “Contract Period.” She also testified that she understood the yearly assignment of contract numbers to be for billing purposes and that the assignment of a new number did not signify the start of a new contract. Buswell testified that the field in its database documentation differentiating between evergreen and non-evergreen contracts was not used by Intergraph for the U.K. contracts because they were all evergreen contracts, and the reason the documentation stated that they were not evergreen contracts was that that was the default entry in Intergraph’s system.
Indicative of the back-and-forth evidence on this subject was the fact that Buswell testified that when a new price quote for a U.K. CRP maintenance agreement was generated, the customer had to accept the quote or the contract would fall into a “lapsed closed” status. He stated that the contract was not actually canceled, however, until the customer affirmatively told Intergraph it was not renewing the maintenance contract. If new quotes were generated on a yearly basis, as the example submitted by Intergraph seemed to indicate they were, then the fact that the contract lapsed without acceptance from the customer evinces the character of a regular agreement. But the fact that a customer affirmatively had to tell Inter-graph it was canceling the agreement is a characteristic of an evergreen agreement.
Because it is apparent that the evidence presented to the special master concerning whether the U.K. maintenance agreements were “evergreen” contracts was conflicting, we cannot say that the trial court erred in accepting the special master’s conclusion that the U.K. agreements were not “evergreen” contracts. Therefore, there was no reversible error by the trial court in calculating the amount owed by Bentley to Intergraph on the note in this regard.
The special master made a “cash adjustment” to the note in Bentley’s favor in the amount of $297,837 as a result of two invoices Bentley alleged that Inter-graph refused to pay. It did so based upon the testimony of one of Bentley’s witnesses, Hewitt, who testified that Inter-graph owed this amount for CRP maintenance agreements Intergraph had improperly renewed.
Intergraph contends that the special master erred in making the cash adjustment because its expert testified that the note calculation included an adjustment in Bentley’s favor for all improperly renewed maintenance agreements, including the two “other invoices.” It also notes that *81 this Court in Bentley I directed that the note be calculated in accordance with the “clear contract language,” 922 So.2d at 82, but that nothing in the note authorized the submission of invoices to Intergraph for payment. Intergraph further alleges that Bentley failed to present any evidence concerning the amount of the invoices.
This argument is without merit. The reason the note did not address how In-tergraph was to pay for improper renewals is that under the agreement Inter-graph was not supposed to renew any of the CRP maintenance agreements after the MCO date. According to the APA, following the closing, Bentley owned the products, it was obligated to provide maintenance services for them, and it was entitled to receive payments for maintenance on them. Put simply, the APA did not contemplate Intergraph’s renewing maintenance agreements. Moreover, contrary to Intergraph’s claim, Bentley established through testimony that it sent Intergraph two invoices in the amount noted in the adjustment the special master made for maintenance contracts Intergraph improperly renewed and for which it failed to reimburse Bentley. Consequently, the evidence supported the special master’s cash adjustment in favor of Bentley based on the unpaid invoices.
(3) Summary of Conclusions Concerning Intergraph’s Assignments of Error
The trial court erred in accepting the special master’s calculation of Bentley’s damages without accounting for Bentley’s costs in executing the agreement, namely an increase in payment on the note to Intergraph. On all other issues raised by Intergraph, the trial court’s judgment is due to be affirmed.

B. Bentley’s Assignments of Error

Like Intergraph, Bentley also contends that the trial court committed several errors by adopting the special master’s findings of fact and conclusions of law. Bentley’s arguments take issue with three aspects of the special master’s conclusions: (1) his award of legal expenses to Intergraph; (2) his limitation of Bentley’s damages to one year instead of five years; and (3) his calculation of the amount Bentley owed Intergraph on the note.
(1) Bentley’s Arguments Concerning the Special Master’s Award of $6,636,144 in Legal Expenses to Intergraph
The special master concluded that Inter-graph was entitled to indemnification from Bentley for legal expenses totaling $6,636,144.20; he concluded that Bentley was entitled to indemnification from Inter-graph for legal expenses totaling $5,731,077.98. Bentley contends that the special master erred in reaching this conclusion.
The APA specifically provides for the recovery of “losses,” which are defined to include reasonable legal fees, arising from a breach of the APA by the other party. In the case of Intergraph, specifically, § 10.2 of the APA states:
“Bentley agrees to indemnify and hold harmless [Intergraph] from and against any and all Losses arising out of, based upon or resulting from:
“(a) any error, inaccuracy or misrepresentation in any of the representations and warranties made by Bentley herein or in any certificate or other document or instrument furnished or to be furnished by Bentley to any of the Selling Entities in connection with this Agreement;
“(b) any violation or breach of any covenant or obligation by Bentley of, or default by Bentley under, this Agreement or any certificate or other doeu *82 ment or instrument furnished or to be furnished by Bentley to [Intergraph] in connection with this Agreement, or the consummation of the transactions contemplated thereby....”
A similar, reciprocal provision is included in the APA providing that Intergraph would indemnify Bentley for losses suffered by Bentley as a result of breaches of the APA by Intergraph.
Among other things, Bentley argues that Intergraph has not established an indemnifiable event. We disagree. As noted, the APA entitles Intergraph to recover for losses, including reasonable attorney fees, arising out of any violation of the terms of the APA by Bentley. Among other things, Intergraph sued Bentley alleging that Bentley failed to correctly adjust the amount of the note in the manner required by the APA. Intergraph succeeded in obtaining thereby a substantial adjustment in the amount of the note, in the process establishing that Bentley had not complied with applicable provisions of the APA. Bentley’s argument that Inter-graph did not establish an indemnifiable event, therefore, is without merit.[9]
Bentley also argues that there was no default by it under the APA because section 10.5 of the APA permitted Bentley to set off its damages against any unpaid consideration due Intergraph under the note. Thus, as long as Bentley’s damages exceeded any improper shortfall in the amount of the note, Bentley contends it did not breach the APA. Section 10.5 of the APA states:
“Notwithstanding anything to the contrary in this Agreement (a) Bentley shall have the right to set-off against the remaining unpaid Consideration (including for such purposes, a reduction in the principal and interest due on the Note which shall be applied first to accrued and unpaid interest and then to unpaid principal) (i) any amounts then due but not paid by Intergraph as a result of any Bentley Losses which any Bentley In-demnitee has incurred and for which such Bentley Indemnitee is entitled to indemnification under this Article X or (ii) any payments due but not paid to Bentley under Section 7.2 in connection with the Maintenance Agreements, and (b) Intergraph shall have the right to set-off against the amounts due to Bentley under Section 7.2 (i) any amounts then due but not paid by Bentley as a result of any Intergraph Losses which any Intergraph Indemnitee has incurred and for which such Intergraph Indemni-tee is entitled to indemnification under this Article X or (ii) at any time while there shall be any past due payment of principal or interest under the Note; any amount of principal or interest then or thereafter to become due under the Note, in whatever order Intergraph may in its discretion elect; provided, however, that Intergraph and Bentley agree and acknowledge that any amounts that the other sets off pursuant to its right under this Section 10.5 shall not be con *83 sidered past due. The parties agree that no other offsets shall be permitted against the amounts payable by each to the other hereunder or under the Note.”
Bentley argues that Intergraph has no “losses” on which legal expenses may be awarded because the damages awarded to Bentley for lost profits exceed the increase in the amount of the note awarded to Intergraph.
We find no merit in this argument. Section 10.5 of the APA does not state that it affects the indemnification provision in section 10.2. The trial court’s judgment awarded Intergraph an additional $1,539,744 on the note because Bentley failed to properly adjust the value of the note. This was in fact a violation of the APA. Again, “losses” are defined in sections 10.1 and 10.2 of the APA to include legal expenses arising from any violation of the APA by Bentley. Intergraph initiated this action because it contended — and the special master and the trial court found — that Bentley had not properly adjusted the amount of the note to pay Inter-graph the amount it was due in the transaction. This is not a case in which Bentley conceded that it had improperly failed to adjust the note by a given amount and simply sought to offset its own losses against the resulting shortfall in the amount of the note. Rather, it is a case in which it was necessary for Intergraph to file a legal action in order to establish the amount of, and its entitlement to, the shortfall in the adjustments that Bentley had made to the note. Under the plain language of the APA, Intergraph was entitled to indemnification of legal expenses reasonably necessary to accomplish this end.
Bentley argues that an interpretation of the APA that permits both parties to recover all of their legal expenses simply “reward[s] the party that spent the most on legal expenses and penalize[s] the party that conducted its case with greater cost efficiency.” We are not unsympathetic to this concern; however, as noted, the plain language of the APA provides for each party’s legal fees arising out of losses it has suffered as a result of breaches by the other party to the agreement. As noted, neither party argues that a recovery of legal fees under the APA should be exclusive of any fees expended in defending against claims for losses suffered by the opposing party. Similarly, except as hereinafter discussed, neither party argues that amounts billed by the other party’s attorneys for given tasks were excessive or otherwise unreasonable.
Bentley further argues that § 6-8-86, Ala.Code 1975,[10] together with Rule 54(d), Ala. R. Civ. P.,[11] dictate that Inter-graph is not entitled to attorney fees because Bentley, not Intergraph, was the “net prevailing party” in this case. Section 6-8-86 and Rule 54(d), Ala. R. Civ. P., concern “costs,” however, not legal expenses. “There is no authority in this state to include attorneys’ fees in the term ‘costs.’” Mass Appraisal Servs., Inc. v. Carmichael, 372 So.2d 850, 852 (Ala.1979) *84 (citing Cincinnati Ins. Co. v. City of Talladega, 342 So.2d 381 (Ala.1977)). These provisions of Alabama law do not apply to the award of legal expenses at issue.
Bentley also complains that the award of legal expenses to Intergraph is excessive because it includes expenses for an expert whose analysis Intergraph abandoned upon remand of the case to the trial court following Bentley I. The award of Intergraph’s legal fees included $1,651,983 in fees and costs for expert work done for the first trial by the accounting group AEA Group, LLC. This work was performed by two of AEA Group’s principals, Denise Dauphin and Lester Alexander. Following our remand in Bentley I, Inter-graph used only Denise Dauphin as an expert. Bentley contends that Intergraph “abandoned” Alexander’s work and, therefore, that the expenses for that work represent “unreasonable” expenses.
Both Alexander and Dauphin worked for the same accounting firm. Dauphin submitted an affidavit related to her expenses in which she explicitly and in detail explained that both she and Alexander performed work for the calculation on the note for the initial trial. According to Dauphin’s testimony, the work performed for the 2004 trial proceedings “was necessary and reasonable to perform the Note calculation required for the proceedings on remand that were before the Special Master.” [12] Intergraph also submitted an affidavit from accountant Don Nalley who helped Dauphin calculate the billing rates and hours for her firm’s work on the case. Nalley testified that in his opinion “all work performed by AEA Group both in the first trial and the remand after appeal ... was reasonable and necessary to analyze and resolve the issues in the original trial, the appeal and the remand.” Bentley did not submit any evidence to the contrary. On the basis of the record before us, we cannot conclude that the special master erred in awarding Intergraph the costs of the AEA Group’s accounting services relating to the first trial as part of “reasonable legal expenses.”
Lastly in relation to the trial court’s award of legal expenses to Intergraph, Bentley briefly argues that the award of legal expenses to Intergraph should not include work relating to Intergraph’s argument in Bentley I that it had a right to *85 renew certain maintenance contracts after the closing of the transaction. Intergraph argued in the initial trial of this matter and in Bentley I, that, for the sake of continuity, it was necessary for it to renew certain maintenance agreements when customers responded to quotes that had been made by to them by Intergraph before the closing. This Court concluded in Bentley I, however, that Intergraph’s argument in this regard was “disingenuous at best.” 922 So.2d at 83. Bentley cites no legal authority and provides little argument as to the issue, however, and we decline to recognize any error based upon it. See Rule 28(a)(10), Ala. R.App. P.
(2) Bentley’s Arguments Concerning the Special Master’s Limitation of Bentley’s Lost Profits to One Year Rather Than Five Years
Bentley contends that the special master erred in limiting its damages to one year, as opposed to five years as Northcut calculated. Northcut calculated that Inter-graph’s breaches caused Bentley to lose $9.4 million in lost profits over five years. The special master and the trial court accepted Northcut’s calculations as to year one but rejected Northcut’s extension of Bentley’s lost profits beyond that year and, as a result, limited Bentley’s lost profits to an award of $2,226,486.
Bentley argues that the special master erroneously resolved doubts concerning its damages against Bentley when the law requires otherwise. Bentley again observes that lost profits need not be calculated “with mathematical certainty.” Morgan v. South Central Bell Tel. Co., 466 So.2d 107, 116 (Ala.1985). Bentley argues that the special master’s limitation of Bentley’s damages to the APA year contradicts the standard set out in Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931), in which the United States Supreme Court stated:
“Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.”
Bentley claims that the special master violated this standard by resolving doubts against Bentley.
Bentley again contends that, by concluding that other factors could have played a role in Bentley’s damages after the APA year, the special master failed to shift the burden to Intergraph and require it to provide evidence that other factors caused those damages for years two through five. It argues that the record demonstrates that Intergraph did not show that there were “other causes” for its lost profits during the five-year period calculated by Northcut, and that, therefore, the special master erred in limiting its damages on that basis.
As noted, the special master concluded that Northcut’s “but for” damages model was accurate with respect to the facts and circumstances as they existed during year one of the APA. The model recognized that Intergraph’s late data submissions, bad data submissions, and improper contract renewals prevented Bentley from *86 converting all the CRP contracts as they expired, thereby resulting in lost profits that extended for a period of five years.
As previously discussed, the importance of continuity with regard to maintenance contracts was undisputed. Bentley’s president and chief executive officer testified that “real damage” would occur if the “maintenance rollover” did not occur in the “sweet spot,” i.e., before the contract expired. Bentley’s vice president of sales testified about the “perishable” nature of maintenance contracts. Intergraph’s own chief executive officer agreed.
The special master specifically found that Intergraph’s breaches prevented such continuity. He concluded that the “incompleteness of the data, the inaccuracies and inconsistencies in the data, and Inter-graph’s improper renewals turned Bentley’s conversion effort in to a chaotic process.”
Despite accepting the aforesaid fundamental tenets, the special master concluded that Bentley could not recover lost profits beyond a one-year “damage window.” In a draft report, the special master stated that the effects of Intergraph’s breaches were eliminated by December 1, 2001. After Bentley filed “suggestions of error” asserting that this conclusion was not supported by any evidence, the special master struck this finding and announced that the problem was that Bentley’s request for damages did not address certain “changing facts and circumstances.” Bentley argues that this latter conclusion is inconsistent with the special master’s findings regarding damages during the APA year, is without support in the record, and is due to be reversed.
Based on our review of the record, we cannot conclude that it provides sufficient support for the conclusion that there were changes of “facts and circumstances” at or near the end of year one that made it appropriate to cut off Bentley’s lost-profit damages at the end of that year. The “changing facts and circumstances” that the special master identified — including the efforts of Bentley’s CRP task force, improvement in the data provided by In-tergraph, and Bentley’s progress in implementing a transition plan — occurred during the APA year. As noted previously, and despite any such changes, Bentley did not renew the expected number of maintenance contracts during year one because of Intergraph’s breaches of the APA. Such changes therefore cannot justify the special master’s decision to cut off damages at the end of year one at a time when Bentley had not yet successfully overcome the effects of Intergraph’s breaches and converted the expected percentage of CRP contracts.
Similarly, there was no evidence at trial or cited in the special master’s report to show that “changing facts and circumstances” invalidated Northcut’s model — a model that took into consideration the fact that the shortfall of profits would diminish in later years as a result of a variety of factors. To the contrary, the evidence shows that Intergraph’s actions prevented Bentley from converting all the maintenance contracts during the APA year. As the special master found, a chaotic situation was created by Intergraph’s renewal of many of these contracts and by its provision to Bentley of late data and bad data.
The only way a cutoff of lost-profit damages at the end of year one would be appropriate is if the effects of Intergraph’s breaches ended at the end of year one. Most telling, however, as to the different approach reflected in the special master’s findings is his finding that by December 1, 2001, Bentley “had received access to data and information from Intergraph that placed it in a position to make contract *87 renewals.” Intergraph returns to this theme in its reply brief, in which it asserts as follows:
“[A]ssigning blame to Intergraph was contrary to Northcut’s testimony that Intergraph’s breaches (bad data, late data and improper renewals) lasted approximately ten months. Stated differently, Northcut recognized that Inter-graph had provided Bentley the data required by the APA (and stopped improperly renewing maintenance agreements) by October of 2001.”
This argument ignores the fact that although Intergraph’s breaches did last only about 10 months, the effect of those breaches lasted much longer. The finding of the special master to the contrary is in conflict with the findings made by the special master as to lost profits during the APA year based on the Northcut model and is not supported by the evidence. Insofar as the judgment is based on that finding, it is due to be reversed and the cause remanded for the trial court to enter an award of damages to Bentley reflecting lost profits suffered by it during the years following the APA year as a result of breaches by Intergraph during the APA year.
(3) Bentley’s Arguments Concerning the Special Master’s Award to Inter-graph on the Note
The remainder of Bentley’s arguments concern the special master’s award of $1,539,744 to Intergraph on the note. Bentley contends for various reasons that the amount of the award was erroneous because it was based on misinterpretations of the APA and on clearly erroneous findings of fact. We address each of these arguments in turn.
First, Bentley contends that the special master’s award of $500,000 in retroactive interest to Intergraph was based on a misreading of the note and the APA. This argument concerns the effective date for interest on the adjusted note balance. Obviously, an earlier date means a larger interest payment. The special master determined the effective date to be December 1, 2000, the date the note was executed. Bentley contends that the effective date should be September 1, 2001, because that was the first date Bentley was able to update the note principal in light of the late TM data provided by Intergraph. Bentley argues that the special master failed to take into account that the December 1, 2000, effective date was predicated on Intergraph’s providing timely TM schedules to Bentley, which it failed to do. Thus, awarding Intergraph interest on the note based on an effective date of December 1, 2000, rewards Intergraph as if it provided the TM schedules in a timely fashion.
The note provides, in pertinent part:
“On March 1, 2001, the principal balance owing under this Note shall, as applicable, be increased or decreased so as to equal one and one-half (1.5) times the Transferred Maintenance Revenues, such adjustment to be effective as of the date of this Note (any increase in such principal amount being referred to as the Additional Principal’). If an adjustment to the principal balance of this Note occurs pursuant to the terms of the Asset Purchase Agreement on June 1, 2001, the principal balance owed under this Note shall, as applicable, be increased or decreased so as to equal one and one half (1.5 times) the Transferred Maintenance Revenues, such adjustment to be effective as of the date of this Note.”
(Emphasis added.)
The APA provides in § 7.1:
*88 “Upon delivery of the Initial Updated Schedule of Transferred Maintenance, the Note shall be adjusted as provided in Section 2.2(c) (ii) and the Intergraph payments described in Section 7.2 below shall be appropriately adjusted with retroactive effect to the MCO Date [December 1, 2000]. If, despite [Inter-graph’s] good faith efforts, the Initial Updated Schedule of Transferred Maintenance does not reflect all Maintenance Agreements in effect as of the MCO Date, then [Intergraph] shall, within 150 days following the Closing, provide Bentley with a further updated Schedule of Transferred Maintenance (‘Second Updated Schedule of Transferred Maintenance’) setting forth all Maintenance Agreements as of the MCO Date.... Upon delivery of the Second Updated Schedule of Transferred Maintenance, the Note shall be further adjusted as provided in Section 2.2(c) (ii) hereof and the Intergraph payments described in Section 7.2 below shall be appropriately adjusted with retroactive effect to the MCO Date.”
(Emphasis added.)
In Section 2.2(c)ii, the APA provides:
“On the three-month anniversary of the MCO Date, the principal balance of the Note, shall be adjusted up or down, effective as of the date of the Note.... If [Intergraph] delivers] the Second Updated Schedule of Transferred Maintenance pursuant to Section 7.1, then on the six-month anniversary of the MCO Date, the principal balance of the Note shall be adjusted up or down, effective as of the date of the Note....”
(Emphasis added.)
Intergraph observes that the language of both the note and the APA states that the effective date for the adjusted value of the note is December 1, 2000, and that this Court emphasized that where the parties’ agreement is clear, the language of the agreement should control. Indeed, Bentley made a similar argument to this Court in Bentley I concerning whether the note adjustment for renewed maintenance contracts was to be made on an “agreement” basis or a “part” basis. Bentley acknowledged that the APA stated that the note adjustment should be made on an agreement basis, but it contended that it had to calculate its note adjustment on a “part” basis because of Intergraph’s failure to deliver Bentley timely and accurate customer-renewal information. This Court rejected Bentley’s rationale, finding that Intergraph’s breaches did “not excuse Bentley from clear contract language.” Bentley I, 922 So.2d at 82.
We similarly conclude that Bentley cannot escape the clear contract language regarding the effective date for the adjusted note value. The language of the APA indicates that whether the value of the note was to be adjusted at all was predicated on Intergraph’s delivering data to Bentley. If the note value was to be adjusted, however, then the date for calculating the value of the note was to be the date of the note, December 1, 2000. The date for calculating the adjusted note value was not predicated on Intergraph’s timely delivering data to Bentley. We see no reason to read the APA as setting a date for the calculation of interest on the note different from the date for calculating the principal on the note. Moreover, inserting a different date for calculating interest not provided by the APA or the note would permit Bentley to benefit from Inter-graph’s breaches of the contract beyond its recovery of lost profits when lost profits are intended to fully compensate Bentley for those breaches.
Second, Bentley complains that the award of $680,973 to Intergraph on the “Part v. Agreement” issue relieved Inter- *89 graph of its burden of proof and was clearly erroneous. As noted above, this Court concluded in Bentley I that § 7.3 of the APA required the RMR component of the note to be calculated by “agreement” and not by the “part.” In other words, if Bentley renewed any part of an Inter-graph CRP maintenance agreement, RMR was to be calculated for all parts of that agreement. Bentley contends that on remand following Bentley I Intergraph failed to provide any evidence of what the RMR would be on an agreement basis. It contends that Dauphin’s testimony did not suffice because she based her calculation on the contract information used by Bentley’s Hewitt to calculate the RMR on a “part” basis. Bentley argues that if Hewitt’s calculation was not done on an “agreement” basis, then neither was Dauphin’s calculation. Therefore, according to Bentley, Intergraph presented no evidence of what the RMR would be on an agreement basis.
We find no merit to this argument. Dauphin used the only information available on this subject, a Bentley database, to calculate the RMR on an agreement basis. Dauphin testified that there was a contract number provided in nearly all Bentley’s schedules so that it was possible to match the parts of agreements that Bentley renewed with the whole agreements that Intergraph had maintained with its customers. Dauphin explained how she performed the calculation this way:
“I matched the Intergraph agreement to what Bentley renewed on that agreement. And if Bentley renewed one line or two lines or parts, I associated and I obtained the contract that Bentley renewed those lines as. And then I basically said if Bentley renewed one line and the contract on Intergraph had four parts or four products, they were to renew all of that, that contract, that Intergraph contract.” In short, as the special master concluded, “Intergraph’s Note calculation is based upon the tracking of Renewed Maintenance on an agreement basis.”
Finally, Bentley contends that the special master’s award to Intergraph for Bentley’s early renewals of CRP maintenance agreements and his refusal to compensate Bentley for late renewals were contrary to the terms of the APA and clearly erroneous. The APA contemplated that Bentley would pay Intergraph 1.5 times the TMR for the period between the MCO date and a CRP maintenance contract’s expiration date during the APA year, regardless of whether Bentley had renewed the contract during that period. Because Bentley serviced these contracts between the MCO date and the expiration dates of the contracts, but Intergraph was responsible for collecting subscription fees from customers during this period, the APA required that Intergraph pay Bentley 95 percent of the contracted-for revenue during this period. If Bentley succeeded in renewing one of these maintenance agreements during the APA year, then the APA required it to adjust the note so as to pay Intergraph 1.5 times the revenues from the date of the expiration of the original agreement to the end of the APA year.
It is undisputed that in some cases Bentley renewed CRP maintenance agreements before the expiration of an Inter-graph customer’s contract during the APA year. As to these agreements, customers would begin making fee payments directly to Bentley before what would have been the expiration date of the customer’s original maintenance agreement with Inter-graph. Despite this fact, because the APA contemplated that Bentley’s renewal of maintenance contracts would not occur until the expiration date of the original main *90 tenance agreement between the customer and Intergraph, the language of the APA required Intergraph to pay to Bentley 95% of the revenues called for by the original maintenance through the original expiration dates.
Conversely, some maintenance contracts renewed by Bentley within the APA year were not renewed until some time after their expiration date. As a result, the note was adjusted to effectively provide for the payment by Bentley to Intergraph of 1.5 times the RMR beginning on the expiration of CRP customer contracts even when Bentley did not begin receiving fees under the renewed contracts until some time after the expiration date of the original maintenance agreements.
The special master awarded Intergraph a cash adjustment for Bentley’s early renewals of CRP maintenance agreements because he found that such an adjustment was “consistent with the APA.” He refused to award a cash adjustment to Bentley for late renewals because he concluded that this was “an equitable concept developed by Bentley’s expert Hewitt to address circumstances alleged to have been caused by Intergraph’s breaches” and because it was “not consistent with the terms of the APA as to the calculation of the note value.”
Bentley contends that neither the early-renewal nor the late-renewal adjustments were contemplated by the APA because the APA “was structured to provide an orderly transition ... from Intergraph to Bentley as the agreements expired or came up for renewal.” Bentley I, 922 So.2d at 66. Therefore, according to Bentley, both adjustments are an equitable method of reimbursing the parties for events not contemplated by the APA. In other words, Bentley contends that, if an early-renewal adjustment is to be made, it is only equitable to make a late-renewal adjustment.
We agree with the special master that the APA requires an early-renewal adjustment. The APA required Intergraph to make payments to Bentley of 95% of revenues under TMR agreements, but only because the APA contemplated that those revenues would be paid by customers to Intergraph. When Bentley renewed contracts early, Intergraph did not continue to invoice and collect TMR from the subscriber through the contract expiration date as was contemplated by the APA. The early-renewal adjustment corrected for the unanticipated early receipt of revenues by Bentley directly from customers. The special master’s award in this regard was not clearly erroneous.
As for Bentley’s claim for a reciprocal late-renewal credit, we note that, through its counterclaim, Bentley was awarded credit for lost profits on contracts it was unable to renew at the time they expired. Awarding Bentley a late-renewal credit would give Bentley a double recovery for profits lost during the period between the expiration of a maintenance agreement and its eventual renewal by Bentley.
Bentley also disputes the amount of early-renewal credit the special master awarded to Intergraph. The special master awarded Intergraph an early-renewal credit of $1,247,834 based on a calculation performed by Dauphin. Bentley calculated Intergraph’s early renewal amount to be $805,999. The difference exists, according to Bentley, because Dauphin’s method made no effort to identify actual parts of agreements renewed by Bentley and, instead, treated any agreement as to which Bentley had renewed any part as if Bentley had renewed the entire agreement. Because the special master accepted Dauphin’s methodology, Bentley contends that Intergraph received credit for parts of *91 maintenance agreements that Bentley did not renew early and, therefore, for which Intergraph may have continued to collect maintenance fees prior to the expiration of the customer’s contract.
As to contracts renewed early by Bentley, whether in whole or in part, the record contains no evidence that the customer, as it began making payments to Bentley under the new maintenance agreement, continued to observe all or any part of its payment obligations to In-tergraph under the original maintenance agreement. Based on the record before us, we cannot conclude that the trial court was clearly erroneous in adopting the methodology proposed by Dauphin of providing Intergraph an early-renewal credit for the entirety of the contracted-for fees under a maintenance agreement renewed only in part by Bentley.[13]
(4) Summary of Conclusions Concerning Bentley’s Assignments of Error
For the reasons herein stated, the trial court erred in limiting Bentley’s lost-profits award to damages sustained during the APA year. The trial court is directed to enter an award of damages for Bentley reflecting lost profits suffered by it during the years following the APA year as a result of breaches by Intergraph during the APA year. On all other issues raised by Bentley, the trial court’s judgment is due to be affirmed.

TV. Conclusion

We find that the trial court erred in accepting the special master’s calculation of damages regarding Bentley’s counterclaim because that calculation failed to include the cost of the increased value of the note in establishing Bentley’s lost-profits damages, and we reverse the judgment in that respect. We also reverse the trial court’s judgment insofar as it fails to award Bentley lost-profits damages for years two through five. In all other respects, the judgment of the trial court is due to be affirmed. We remand the case to the trial court for it, either with or without the assistance of the special master, to hear argument from the parties and to enter a judgment consistent with this opinion.
1080300 — AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
1080405 — AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
LYONS, STUART, and BOLIN, JJ., concur.
COBB, C.J., concurs in the result.

. The amount included interest on the judgment.

. As we explained in Bentley I, the record included no live testimony; therefore, our review was de novo. Bentley I, 922 So.2d at 70-71.

. Rule 53(e)(1), Ala. R. Civ. P., requires a special master to “prepare a report upon the matters submitted to the master ... and, if required to make findings of fact and conclusions of law, the master shall set them forth in the report.”

. Rule 53(e)(2), Ala. R. Civ. P„ provides, in pertinent part, that in a nonjury action the trial court
“shall accept the master’s findings of fact unless clearly erroneous. Within ten (10) days after being served with notice of the filing of the report any party shall serve any written objections thereto upon the other parties.... The court after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions.”

. On December 16, 2008, Bentley paid Inter-graph $281,204.52, which included interest on the judgment.

. Intergraph objects to the special master's use of Hewitt’s testimony to elaborate on any portion of Northcut’s damages calculation. It contends that Hewitt lacked personal knowledge, in violation of Rule 602, Ala. R. Evid., because Northcut had testified that no one assisted him with his calculation, and that Hewitt’s testimony violated Rules 701, 702, and 703, Fed.R.Evid., pertaining to the requirements of expert-witness testimony. We conclude that the special master properly limited Hewitt's testimony to avoid the errors Intergraph alleges. Furthermore, the Court finds that Intergraph failed to provide adequate arguments in its brief in this regard. See Rule 28(a), Ala. R.App. P.

. On the other hand, the special master concluded that Northcut’s "but for” damages model failed to account for changed facts and circumstances after the APA year. The “changing facts and circumstances” the special master explicitly highlighted for the period after December 1, 2001, did not include any of the eight "other causes” listed by Inter-graph as possibly affecting Bendey's profits from the CRP maintenance agreements.
We discuss in Part III.B.(2) of this opinion the special master’s conclusion that North-cut’s damages model failed to account for “changed facts and circumstances” after December 1, 2001, and, therefore, that Bentley failed to prove any loss of profits in years two through five.

. In oAer words, Ae ultimate burden of proof on issues of causation and damages would remain wiA Ae plaintiff in relation to any "other cause” as to which Ae defendant meets its "obligation to go forward with evidence” as explained in Fontana and Corson.

. It appears that the legal expenses awarded to Intergraph included substantial amounts of fees incurred not only in an effort by Inter-graph to recover indemnifiable "losses" suffered by it, but also amounts incurred in defending (sometimes successfully and sometimes not) against claims made by Bentley that Intergraph had breached the APA and caused Bentley to suffer losses. The same appears to be true of some of the legal fees awarded to Bentley. Neither party argues that the award of fees to the opposing party should be adjusted based on such a distinction, and we therefore do not address it further. See Smith v. Mark Dodge, Inc., 934 So.2d 375, 380 (Ala.2006) (noting "the well-settled rule that we do not reverse a trial court’s judgment on a ground not raised on appeal”).

. Section 6-8-86, Ala.Code 1975, provides, in pertinent part:
"On a compulsory counterclaim, if the claim or demand of the defendant equals the claim or demand of the plaintiff, judgment must be entered for the defendant; if the claim or demand of the defendant exceeds the claim or demand of the plaintiff and the plaintiff is the party liable to its satisfaction, judgment must be entered against him in favor of the defendant for such excess and all costs.”

. Rule 54(d), Ala. R. Civ. P., provides, in pertinent part, that "[ejxcept when express provision therefor is made in a statute, costs shall be allowed as of course to the prevailing party unless the court otherwise directs.... ”

. Testimony indicated that AEA Group work relating to the 2004 trial proceedings that also was used on remand included the following:
"1. Gaining an understanding of relevant issues, including the APA;
"2. Reading and reviewing virtually all of the documents produced by the parties;
“3. Assisting in discovery;
“4. Interviewing at least fourteen (14) In-tergraph employees;
"5. Meeting with and having follow-up discussions with at least thirteen (13) of Intergraph’s worldwide Business Operations Managers;
“6. Translating and consolidating the Transferred Maintenance Schedules;
"7. Translating Intergraph's maintenance contracts;
"8. Reviewing Bentley’s maintenance contract;
"9. Gaining an understanding of six (6) separate billing systems used by the parties worldwide;
"10. Verifying the accuracy and completeness of the TM Schedules;
"11. Investigating differences in the TM Schedules;
"12. Analyzing various Bentley databases;
"13. Verifying and comparing payments made by Bentley and Intergraph;
"14. Verifying renewals by Bentley;
"15. Calculating required cash adjustments to the Note;
"16. Calculating required foreign currency adjustments;
"17. Calculating interest;
"18. Reading all deposition testimony and categorizing by issue;
"19. Reviewing and analyzing Northcut's report and related production; and
"20. Attending Northcut's deposition.”

. This approach is consistent with our conclusion in Bentley I that "Bentley must track its renewals on an 'agreement' rather than 'part' basis for purposes of the valuation of the note.” 922 So.2d at 82.